# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2437-17T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

T.H.,

      Defendant-Appellant,

and

J.U.,

      Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF J.N.H., a Minor.

_____

      Argued October 15, 2018 – Decided October 26, 2018

      Before Judges Fasciale and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0104-18.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Angela N. Domen, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Laura A. Dwyer, Deputy Attorney General, on the brief).

Meridith A. Pollock, Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meridith A. Pollack, of counsel; Charles M. Ouslander, Designated Counsel, on the brief).

PER CURIAM

Defendant (the father) appeals from a January 10, 2018 order terminating his parental rights to J.N.H., his daughter born in 2009. Defendant challenges the sufficiency of the evidence and argues that the Division of Child Protection and Permanency (the Division) failed to satisfy N.J.S.A. 30:4C-15.1(a), which requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to [the judge's] fact[-]finding." Cesare v. Cesare, 154 N.J. 394, 413 (1998). Thus, the judge's findings of fact

A-2437-17T3

are not disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

"When a biological parent resists termination of his or her parental rights, the [trial judge's] function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). The judge's factual findings, "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc., 65 N.J. at 483-84)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

Judge Francine I. Axelrad conducted the FG trial, entered the order, and rendered a comprehensive oral opinion. The evidence showed that defendant has failed to find stable housing since his release from prison, and he has anger

issues and a criminal record. The evidence also showed that doctors diagnosed defendant with cannabis abuse disorder. We affirm substantially for the reasons the judge gave, but add the following remarks.

As to the first prong, the judge relied on testimony from the Division's clinical psychologist, Dr. Frank Schwoeri. The doctor testified that the child has "already experienced much attachment disruption, instability and insecurity, having been removed three different times from the care of her biological parents and having been in foster care placement continuously now for the past two years subsequent to her final and third removal from her parents' care." The judge found the psychologist's perceptions to be "helpful [and] insightful," and considered the facts with a "tremendous emphasis" on the doctor's expert testimony.

The judge explained that defendant failed to understand that this was his last opportunity to show that he was considering the child's "safety, health, or development." She stated that there is a

> statutory requirement of permanency and stability, . . . because [children are] not chattels that can be placed on a shelf until a parent decides at some point in time that they're going to find employment or find housing, or do something and step back into the children's lives and parent them. So, although [defendant] means well, or means well perhaps in his heart, I did not find his testimony to be compelling insofar as any plans for

what he's providing for his daughter, or has provided
for his daughter.

The judge additionally found that defendant's testimony "seems to be more from his perspective than from his daughter's perspective." The judge reasoned that defendant "has not been there for [the child] as a nurturing force to provide a safe, stable and permanent home. He has not stepped up to the plate and done so."

As to prong two, the judge explained that the focus is "parental unfitness." Our Supreme Court has opined that

> the second prong may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [K.H.O., 161 N.J. at 353.]

The judge found that "the reality is that [defendant] didn't demonstrate effort." She further explained that defendant, "didn't follow up with the Division, he didn't follow up with the court, he didn't follow up with evaluations. His attitude was to stick his head in the sand. . . . But when you have a child who needs you, you put [her] needs first." Defendant conceded that even if he attended several

drug tests as requested by the Division, he would have tested positive for marijuana.

Defendant contends that his prior criminal history and probation restricted his ability to find adequate housing. He also argues that the Division concedes that had defendant secured housing by August 2017, reunification with the child would have been "[q]uite possible." But the judge stated:

> [T]his case is not just about housing, . . . housing is the underpinning, because [defendant] was told . . . [by] the Division and told by the court over, and over, and over, and over, ad nauseam, this is what you've got to do. This is what you've got to do if you want your daughter back.
>
> [(Emphasis added).]

The judge referred to Dr. Schwoeri's testimony, as well as the testimony of Shaquaya Johnson, who has been the child's adoption case manager since June 2017. In his expert opinion, Dr. Schwoeri felt that the child has a positive relationship with her resource parents and resource family, whom she has resided with since December 2016. Dr. Schwoeri performed a bonding evaluation between the child and her resource parents to assess the attachment between the child and the resource parents. He testified that:

> When I asked her if she enjoys living with this family, she said yes, very clearly. When I asked her if she would miss her foster parents if she went back to live

7

> with her mom and/or dad, she began to cry, she began to tear up at the very thought of that, and then nodded yes, very emphatically, that she would miss her foster parents if she left them.
>
> When I asked her if she would miss her biological parents if she remained living with her foster parents, she shook her head no, again, very firmly. And when I asked her what her preference would be for a permanent living arrangement, she replied very strongly that she wants to stay with this foster family.

Dr. Schwoeri reported that, "[i]t is my opinion that these foster parents are currently very clearly providing the sensitive, attuned, and responsive care which [the child] needs in order to thrive going forward." He opined that the attachment that the child has with her resource parents is "strong" and explained that "[c]hildren with multiple disruptions become more vulnerable to the deleterious effects of subsequent disruptions in the continuity of their attachment relationship." Dr. Schwoeri stated that he often asks his child-patients what they would want if they had three wishes. The child responded that she wished to have a dog, to be adopted by her resource parents, and to get straight As in school. According to Ms. Johnson, the child even hopes to change her name to be more similar to the siblings in her resource family. The doctor reported that the resource parents have already "psychologically adopted" the child.

A-2437-17T3

The resource mother attempted to bring the child to visitations with defendant. But, on numerous occasions, defendant either cancelled in advance or simply failed to show. This led to the child informing the Division worker that she wanted her resource family to adopt her as her father did not "even bother[]" to see her. The child also told her adoption support therapist that adoption means "you become part of a family forever."

The judge considered the fact that defendant continued to smoke marijuana throughout the pendency of the litigation and failed to find employment or housing. The judge concluded that defendant showed apathy toward building a relationship with the child and that his actions "demonstrate[d] his unwillingness, or inability to eliminate the harm facing the child, and to provide a safe and stable home for her." Most essentially, the judge felt that if the child was removed from the resource home she would "suffer significant and enduring harm."

As to prong three, the Division scheduled psychological and substance abuse evaluations, drug treatment programs, and therapeutic visits with the child. It also provided defendant with bus passes, but all to no avail. The Division was also willing to pay the first month of defendant's rent and his security deposit, conditioned on his securing adequate housing that he could live

in with the child. The judge found that the Division considered alternatives to termination of parental rights. The child lived with her paternal grandparents, maternal grandmother, paternal great aunt and uncle, and paternal aunt, but these placements failed. And the judge found that defendant's assertions that one of his sisters or other relatives may be able to take the child were mere "wish[es]" on defendant's part and not realistic.

The fourth and final prong under N.J.S.A. 30:4C-15.1(a) requires the Division to prove that "[t]ermination of parental rights will not do more harm than good." It has been described as, "a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). This prong

> cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents.

> [K.H.O., 161 N.J. at 355.]

The judge was careful to note that terminating defendant's parental rights does not mean that he can never be part of the child's life or that the child will forget about defendant. She clarified that, "it would seem to me that if it's in [the

child's] best interest to continue to have contact with [defendant], . . . [then the child's] going to do that. If it's not in the [child's] best interest, she's not going to do that. A lot is going to depend upon how [defendant] acts."

Our Supreme Court has explained that, "[t]he risk to children stemming from the deprivation of the custody of their natural parent is one that inheres in the termination of parental rights and is based on the paramount need the children have for permanent and defined parent-child relationships." In re Guardianship of J.C., 129 N.J. 1, 26 (1992). Courts should consider "the testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent." Id. at 19. This is precisely what the judge did, despite defendant's suggestion that nothing in the record "conclusively establishes that [defendant] could not safely raise [the child]."

On appeal defendant argues for the first time that the resource mother told the child that defendant could not care for the child and wanted her to stay with the resource family, thus, influencing the child's comments about wanting to be adopted. He points to a comment in the Division's notes that states, "[the resource mother] indicated that she lets [the child] know that [defendant] loved her enough to know that [he was] unable to care for her and wanted her to be

11

with someone who would make sure that she was safe and well cared for." Defendant argues that because of this, the Division should be "estopped from terminating . . . [defendant's] parental rights, when trial testimony was relied upon that stated the [child] now wanted to live with and be adopted by the foster care family, when she was under the misimpression that . . . [defendant] abandoned her." Yet the judge found the Division satisfied its burden under prong four by relying heavily on the expert testimony. The judge stated:

> And I have to look at the facts with an emphasis, a tremendous emphasis, on expert testimony of what this child needs. And the expert testimony, compelling expert testimony, was that she needs permanence and stability.

In reaching her final decision, the judge properly determined that defendant would need more than a "wish and a prayer" to retain his parental rights. "A child is not chattel in which a parent has an untempered property right. The State has a parens patriae responsibility to protect children from the probability of serious physical, emotional or psychological harm resulting from the action or inaction of their parents." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 110 (App. Div. 2004). The judge explained, "I don't doubt that [defendant] loves [the child], but we don't focus here on what's best for [defendant]. The court under the law has to focus on the best interest of [the

child]." After considering the testimony and observing the witnesses' demeanors, the judge concluded that the Division met its burden of proving each of the four prongs by clear and convincing evidence that it would be in the best interests of the child to terminate defendant's parental rights so that the resource family could adopt her.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2437-17T3