# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1804-19T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.W. and B.Y.,

     Defendants,

and

J.P.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.T.W.,
a minor.

_____

Submitted November 12, 2020 – Decided December 8, 2020

Before Judges Fuentes, Rose, and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0028-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Steven Edward Miklosey, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant J.P. is the biological father of J.T.W., a five-year-old boy identified here as James.[1]  On February 20, 2019, the Division of Child Protection and Permanency (Division) filed a guardianship complaint in the Chancery Division, Family Part against defendant seeking the termination of his

---

[1] We use initials to identify the parties and a pseudonym to identify the child to protect and preserve the confidentiality of these proceedings.  R. 1:38-3(d)(12); R. 5:12-1.

parental rights to James.[2] Judge Mary K. White presided over a three-day trial on October 15, November 19, and December 10, 2019. Judge White found the Division proved, by clear and convincing evidence, that termination of defendant's parental rights was in James' best interest. N.J.S.A. 30:4C-15.1(a). On December 16, 2019, Judge White entered a final judgment of guardianship terminating J.P.'s parental rights. She articulated her factual findings and explained her legal analysis in a comprehensive oral decision delivered from the bench that same day.

In this appeal, defendant argues the Division did not present sufficient credible evidence to satisfy the four-prong statutory standard codified in N.J.S.A. 30:4C-15.1(a). We disagree and affirm substantially for the reasons expressed by Judge White. The record shows defendant's criminal activity and subsequent imprisonment precluded him from developing a meaningful parental relationship with his young son. Furthermore, during the brief period of time defendant had unfettered access to James, defendant failed to take any steps to

---

[2] In this same action, the Division sought to terminate the parental rights of James' biological mother D.W. to both James and her oldest child, J.W., and terminate the parental rights of J.W.'s biological father, B.Y. D.W. and B.Y. did not participate in the proceedings before the Family Part and they are not part of this appeal.

protect his son from the chaotic, dysfunctional home environment created by his biological mother's heroin addiction.

The record also shows the Division made a good faith effort to verify the suitability of defendant's alternative placement proposals. The agency sent to investigate the placement option in Guatemala was unable to gather sufficiently reliable information to form an opinion about the suitability of the proposed location.

By the time this case came before Judge White, the Division had previously sustained both defendant and James' biological mother for neglect. The biological mother was arrested after she left James' two older siblings alone in a parked car while buying illicit drugs. Defendant's neglect arose from two separate incidents of domestic violence. James was also physically and cognitively abused by his mother when she continued to use heroin during her pregnancy. Although defendant resided with James' mother at the time, he claimed to being unaware of her drug use.

When James was born, the hospital staff notified the Division about the biological mother's prenatal heroin use. The Division executed a Dodd[3] removal

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82. The

of James and his sibling two days later. James suffered from neonatal abstinence syndrome at birth and remained in the neonatal intensive care unit for an extended period of time. The Division placed James in a resource home after he was discharged from the hospital.

Both defendant and the biological mother participated in court-ordered services. The mother participated in intensive outpatient treatment and methadone maintenance. In September 2016, after months of successful supervised and unsupervised parenting time, the Family Part approved the Division's reunification plan to start in December 2016. This tentative step toward reunification proved to be short lived.

On March 6, 2017, defendant was arrested and charged with third degree aggravated assault with a deadly weapon. He pled guilty to this charge in September 2017 and was sentenced to a three-year term of imprisonment. Immigration and Customs Enforcement (ICE) also filed a federal detainer based on defendant's immigration status as an undocumented alien. He was transferred to Southern State Correctional Facility in November 2017.

---

Act was authored by former Senate President Frank J. "Pat" Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

Despite multiple referrals, James' biological mother continued to use heroin while defendant was incarcerated. During a home inspection, Division caseworkers discovered James and his older sibling were living in "deplorable" conditions: rotten food littered the apartment, the children were unwashed and sleeping on a soiled mattress, and the only toilet was inoperable. The Division executed a second Dodd removal that day and placed James in a resource home.

During the time defendant served his State prison sentence, the Division coordinated monthly visits with defendant and James at Southern State Prison. Caseworkers also encouraged defendant to take advantage of the available services there. Although the visits went well, it was highly unlikely that defendant would remain in the United States upon his release from State prison. Despite this legal impediment, defendant offered his then-new girlfriend as a potential placement option for James. The Division ruled her out.

Defendant also identified his brother in Guatemala as a possible placement option. The Division arranged for an international agency to visit and inspect defendant's brothers' house in Guatemala. However, this plan proved to be futile since his brother only agreed to care for James for three months. The Family Part approved the Division's plan for termination of parental rights on January 14, 2019. Defendant completed his State prison sentence on June 4, 2019 and

was thereafter turned over to ICE's custody. He was deported to Guatemala on June 28, 2019.

In May 2019, defendant underwent a court-ordered psychological evaluation. According to psychologist JoAnne González, Ph.D. who authored the report, defendant "lack[s] insight into his current situation," and "is distrustful of others." The psychologist was also concerned about defendant's anger management, "especially when considering his lack of insight." She opined that defendant was unlikely "to see himself as in need on any services." Although defendant wanted to offer James "everything he needs," the psychologist noted he was "unable to discuss the specific aspects of [James'] life that would identify any of these needs." Defendant showed "significant parenting deficits," and possessed "a naïve approach to parenting challenges." In the psychologist's opinion, termination of defendant's parental rights supported James' "need [for] permanency in his life."

Dr. González also conducted a bonding evaluation of defendant with James. During the evaluation, defendant suggested another parenting arrangement, whereby defendant's girlfriend, whom the Division had previously ruled out, would live with defendant and James in Guatemala for three months. She would then return to the United States with James for one month before

7

returning again to Guatemala for another three-month stay. Dr. Gonzalez found this arrangement lacked structure and consistency, two indispensable aspects of a stable home environment. A child needs to reside where he or she can "anticipate what will happen next."

Dr. Gonzalez concluded that "[t]he bond between [James] and his father is positive but insecure." On the positive side, she acknowledged that defendant "is certainly a familiar person that [James] has become used to visit with some regularity over the past year." However, James does "not experience[] him as a parent." The child "does not trust that he will be able to meet his needs at this time." In Dr. Gonzalez's opinion, James viewed his relationship with defendant similar to a "distant relative."

Dr. Gonzalez also conducted a bonding evaluation of the resource parents. She opined that James and his resource parents had formed a "strong and secure" bond. The child "loves them, relies on them and knows that they will be there for him at all times." This strong attachment will allow James to "develop a sense of basic trust that will also serve as the basis for all future emotional relationships." Dr. Gonzalez noted that the child already "relate[s] very well to his foster siblings…." Thus, separation from his resource parents would "result in an extreme sense of loss for [him]." A rupture of this relationship would be

a severely negative event that would likely affect James' development and cause "enduring emotional damage in his life." Dr. Gonzalez recommended the termination of defendant's parental rights followed by James' adoption by his resource parents.

In her decision, Judge White emphasized that defendant's incarceration was not a dispositive factor to any statutory prongs of the best interest standard. She also made clear that she did not rely on any "inclination[s] towards criminality." However, she would consider defendant's unavailability during his two years of incarceration. Stated differently, Judge White viewed defendant's incarceration as "a material factor that bears on whether parental rights should be terminated." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 555 (2014) (quoting In re L.A.S., 134 N.J. 127, 143 (1993)).

Mindful of these legal standards, Judge White noted that at the time of his arrest defendant was aware

> he was in an undocumented status and was at risk of [] deportation. But then add the criminal behavior and the conviction and the imprisonment . . . and he greatly enhanced that risk.
>
> So his unavailability is directly linked to his incarceration and that's directly linked to his own behaviors, not simply being a refugee in a strange land. But putting himself completely in the spotlight of public policy by engaging in illegal behavior.

9

The judge reviewed the evidence presented at trial, applied the statutory standards in N.J.S.A. 30:4C-15.1(a) not as discrete and separate elements, but as overlapping factors that "offer a full picture of the child's best interests." R.G., 217 N.J. at 554. Guided by these principles, Judge White concluded:

> [James'] bond with his dad is positive, not just that there's an attachment, but that it's a good one. But it's insecure. And…that…insecurity as being the result of dad not being there when, you know, day to day he needs dad. And I've already gone through all the findings about why that's not excusable or mitigatable just because dad couldn't be there because he was in prison….
>
> The child does not sense that dad is able to meet his needs and frankly, based on dad's plan that he presented…I don't see it either in anyway that dad's plan is a challenge to the Divisions' [burden of] proof….

Our standard of review of a judge's factual findings in these difficult cases is well-settled and we need not restate it here. Cesare v. Cesare, 154 N.J. 394, 413 (1998). Judge White's findings and conclusions are supported by competent evidence in the record. We discern no legal basis to disturb them in any way. We thus affirm substantially for the reasons expressed by Judge White in her thorough oral decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1804-19T2