631 A.2d 928

IN THE MATTER OF THE ADOPTION OF CHILDREN BY L.A.S.

Argued March 29, 1993—Decided August 5, 1993.

128

*Anthony J. Frese* argued the cause for appellant, L.A.S. (*Greenberg, Mellinger, Sanders & Frese,* attorneys; *Maureen Goode,* on the briefs).

*Harriet J. London* argued the cause for respondent, H.E.

*Sheila Crotty,* Deputy Attorney General, argued the cause for *amicus curiae,* New Jersey Division of Youth and Family Services (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This appeal raises the issue of whether parental rights may be terminated because the parent will be incarcerated for a lengthy period. The parent whose rights are at stake in this case is the natural father of two children. He was convicted of murder, for which he is serving a life sentence subject to a period of parole ineligibility for thirty years. The husband of the natural mother, the stepfather of the children, petitioned for their adoption. The petition was opposed by the natural father.

The trial court found that the natural father's incarceration constituted an abandonment of parental duties and terminated his parental rights. The Appellate Division, in a reported decision, 258 *N.J.Super.* 614, 610 *A.*2d 925 (1992), reversed and remanded for a more extensive hearing, ruling that a parent's incarceration cannot be the sole basis for terminating parental rights. This Court granted the adoptive father's petition for certification, 130 *N.J.* 599, 617 *A.*2d 1222 (1992).

I

H.E., the natural father, and L.S. were married on October 29, 1976. H.E. and L.S. had two sons: H.A.E., born May 8, 1977, and J.E., born December 14, 1978. The parents separated in 1980 and were divorced on September 8, 1982. Joint custody was awarded at that time and visitation was granted to H.E. In 1980 L.S. met plaintiff, L.A.S., and began living with him six months later. L.A.S. began supporting the children in 1981, and married L.S. in December 1982.

In early 1985, H.E. and his brother were arrested and charged with hiring a man to kill his brother's ex-wife. H.E. was convicted of conspiracy to commit murder and first-degree murder on June 17, 1986, and was sentenced to life imprisonment with thirty years' parole ineligibility. J.E. and H.A.E. were eight and six years old at the time of L.E.'s imprisonment. H.E. has been and is currently incarcerated in New Jersey State Prison.

L.A.S. filed a complaint for adoption of J.E. and H.A.E. on October 12, 1990, in the Chancery Division. The court set a date for the preliminary hearing and ordered an investigative report from Better Living Services, Inc. on the placement of the children in petitioner's home, pursuant to *N.J.S.A.* 9:3–48a(2). Better Living Services evaluated the children and the adoptive family, but not the adoptive father, and recommended adoption. H.E. entered an objection to the adoption.

At the adoption hearing, L.S. testified that since the separation, H.E. had seen his children a few times and once while in prison five or six years ago. L.S. stated that the boys had been "very scared" to see their father in prison. After the visit they told her and her husband that they did not want to go back because "it was a very scary situation for them." At the close of the applicant's case, the court denied a motion to dismiss, stating that the applicant had presented evidence of a *prima facie* case of "constructive abandonment."

H.E. then testified that he had had a "great relationship" with his sons before the separation from his wife. After the separation, he saw his sons on a weekly basis, as well as during two-week summer vacations. Initially following H.E.'s incarceration in 1985, he was able to communicate with his children on a weekly basis by phone and through letters and cards. H.E. submitted a psychological report compiled shortly after his incarceration, which found that the children seemed emotionally well-adjusted but were confused and frightened about H.E.'s incarceration. The report noted that the children had had "consistent experience with their father," that they had a need to continue contact with their father, and that arrangements should be made to facilitate such contact without traumatizing the children.

H.E. testified that he had seen his sons once since his imprisonment, and that they had been very happy to see him on that occasion. After that visit, however, L.A.S. changed addresses. H.E. stated that he had written to his sons repeatedly but had received no response. H.E. had not been able to maintain contact with his children despite the efforts of the prison priest and a social worker to locate them. In 1990, H.E. had also attempted to communicate with his ex-wife and L.A.S. to arrange visitation with his children, but had received no response.

The court asked the boys, aged fourteen and twelve respectively, whether they wanted him to grant their stepfather's application for adoption. The boys replied that they did. The court also interviewed them *in camera* to determine that the boys were not speaking under any duress.

Following H.E.'s testimony, the court decided on the record that H.E. had abandoned his children. The court based its conclusion on the fact of H.E.'s lengthy period of incarceration, stating that during the past five or six years of H.E.'s imprisonment, "he has not been able to render any of the regular or expected parental functions of care and support of these children as required." The court stressed that H.E.'s incarceration would last a total of thirty years, during which time he would continue to be unavailable to

his children as a parent. It determined that the commission of a crime is equivalent to intending the consequences of that crime, including imprisonment. The court concluded by terminating H.E.'s parental rights and granting the adoption by L.A.S., noting, "The evidence clearly indicates that the granting of this application is in the best interests of [H.A.E. and J.E.]."

The Appellate Division reversed the trial court judgment to terminate H.E.'s parental rights, concluding that the trial court erred in basing its decision solely on the fact of H.E.'s incarceration. 258 *N.J.Super.* at 621, 610 *A.*2d 925. It noted that courts are generally reluctant to terminate "something so fundamental as the relationship of natural parent and child." *Id.* at 618, 610 *A.*2d 925. Therefore, parental rights should be terminated only after the trial court has engaged in a "multi-facet [*sic* ] evaluation of abandonment in which incarceration is but one of the factors considered." *Id.* at 620–21, 610 *A.*2d 925. Accordingly, it remanded the matter for a further hearing in which both sides could present evidence refuting or supporting abandonment. *Id.* at 621, 610 *A.*2d 925.

## II

The right of a parent to enjoy a relationship with his or her child is considered fundamental, and is constitutionally protected. *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972); *New Jersey Div. of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986). Termination of parental rights—in contrast to the loss of custody of one's children—permanently severs the relationship between children and their biological parents. *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). The United States Supreme Court in *Santosky v. Kramer,* 455 *U.S.* 745, 762–64, 102 *S.Ct.* 1388, 1399–1400, 71 *L.Ed.*2d 599, 612–13 (1982), has evaluated the evidentiary standard to be applied in termination proceedings, and held that the constitutional concern for the parental interest is heightened by a combination of factors. Those factors include the nature of this

fundamental right, the permanency of the threatened loss, the complexity and subjectivity involved in evaluating parental fitness.

Thus, the Supreme Court has insisted that the State may not permanently deprive a parent of all rights to the child unless the State has shown by clear and convincing evidence adduced at a full hearing that the parent is "unfit." *Id.* at 769, 102 *S.Ct.* at 1403, 71 *L.Ed.*2d 616; *Stanley, supra,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551. Presumptions of unfitness that render those rights less protectable may not be used in proceedings challenging the parental rights. *Stanley, supra,* 405 *U.S.* at 655, 92 *S.Ct.* at 1215, 31 *L.Ed.*2d at 561–62. We have similarly imposed high standards that must be satisfied before a parent's rights will be terminated. *J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312. Further, all doubts must be resolved against termination of parental rights. *In re Adoption of D.,* 61 *N.J.* 89, 93, 293 *A.*2d 171 (1972).

In New Jersey, the termination of a parental interest may be initiated by governmental action in the form of a petition for guardianship by the Division of Youth and Family Services ("DYFS"), *N.J.S.A.* 30:4C–20; a State-approved agency, *N.J.S.A.* 9:2–18; or private parties in the context of a private-placement adoption. *N.J.S.A.* 9:3–46(a); *N.J.S.A.* 9:3–48(c)(1).

The statute governing the termination of parental rights of a child in the custody of DYFS or a state-approved agency requires a showing that the parent has failed for at least one year, despite the agency's diligent efforts, to rectify the circumstances leading to removal. *N.J.S.A.* 30:4C–15(d). Those circumstances include endangerment of the child's welfare, *N.J.S.A.* 30:4C–12; endangerment of the child's health and development, *N.J.S.A.* 30:4C–15.1(a); and abuse or neglect of the child. *N.J.S.A.* 9:6–8.33.

The termination of parental rights in the context of a private adoption requires either intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the near future. *N.J.S.A.* 9:3–48c(1). Alternatively, termination of parental rights may be ordered if the parent "has substantially failed to perform the regular and expect-

ed parental functions of care and support of the child, which shall include maintenance of an emotional relationship with the child." *N.J.S.A.* 9:3–46a.

We noted in *In re Baby M.*, 109 *N.J.* 396, 537 *A.*2d 1227 (1988), that despite the differences in the respective statutory descriptions of the conditions required to terminate parental rights, the substantive standards governing both public and private termination proceedings are roughly equivalent to one another. *Id.* at 444–45, 537 *A.*2d 1227 (comparing *A.W., supra,* 103 *N.J.* at 601–11, 512 *A.*2d 438 (articulating standard to govern termination proceedings brought by DYFS) with *In re Adoption by J.J.P.,* 175 *N.J.Super.* 420, 419 *A.*2d 1135 (App.Div.1980) (describing standard governing terminations in connection with private placement adoption)). A synthesis of our cases indicates essentially two grounds that justify the termination of parental rights. One involves abandonment; the other is based on unfitness. We have emphasized in every context that a very strong showing of abandonment or neglect, *id.* at 428, 419 *A.*2d 1135, or a similar showing of unfitness, is required. *Id.* at 426, 419 *A.*2d 1135. Further, the termination of parental rights that is a basis for the adoption of a child must always be found to be in the child's best interests. *J.C., supra,* 129 *N.J.* at 17, 608 *A.*2d 1312; *A.W., supra,* 103 *N.J.* at 603, 512 *A.*2d 438; *In re Adoption of Children by D.,* 61 *N.J.* 89, 95, 293 *A.*2d 171 (1972).

The grounds for termination of parental rights frequently overlap and often are not clearly differentiated. *See, e.g., N.J.S.A.* 9:6–1 (defining both abandonment and neglect of a child in terms of failure to care for and protect child in various ways); *State v. Muniz,* 150 *N.J.Super.* 436, 375 *A.*2d 1234 (App.Div.) (finding neglect of child by parents may be shown by proof of willful failure to provide food, clothing, maintenance, or medical treatment), *certif. denied,* 77 *N.J.* 473, 391 *A.*2d 488 (1977). Nevertheless, they are not identical.

■ Abandonment requires a finding that a parent has willfully forsaken obligations, although physically and financially able to

discharge those obligations. *N.J.S.A.* 30:4C–15(d); *J.C., supra,* 129 *N.J.* at 17, 608 *A.*2d 1312; *In re Guardianship of K.L.F.,* 129 *N.J.* 32, 39, 608 *A.*2d 1327 (1992). The parent must have engaged in a course of conduct that "evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re N.,* 96 *N.J.Super.* 415, 426, 233 *A.*2d 188 (App.Div.1967).

■ Termination of parental rights based on unfitness often involves the very substantial neglect of parental duties, with no reasonable expectation of any reversal of that conduct in the near future. *Sorentino v. Children's Soc'y of Elizabeth,* 74 *N.J.* 313, 322, 378 *A.*2d 18 (1977); *In re D., supra,* 61 *N.J.* at 94–95, 293 *A.*2d 171. Parental unfitness also requires that the parent's failings have actually harmed the child or imminently threaten such harm. *A.W., supra,* 103 *N.J.* at 616, 512 *A.*2d 438; *see N.J.S.A.* 30:4C–15.1, *L.* 1991, *c.* 275, § 7 (codifying factors that demonstrate parental unfitness, including demonstration of harm to child).

### III

■ Clearly the incarceration of a parent is a relevant factor in determining whether the parent-child relationship may be terminated. It has specifically been so recognized by a number of states. *See, generally,* Philip M. Genty, *Procedural Due Process Rights of Incarcerated Parents in Termination of Parental Rights Proceedings: A Fifty State Analysis,* 30 *J.Fam.L.* 757 (1991) (reviewing state statutory and decisional law that addresses factor of parent's incarceration in termination proceedings). Some states by statute specify that incarceration is a dispositive factor militating against the continuation of the parent-child relationship. *E.g., Colo.Rev.Stat.* § 19–3–604 (1986 & Supp.1991); *Iowa Code Ann.* § 232.116 (1985 & Supp.1991); *La.Stat.Ann., Children's Code,* art. 1015 (Supp.1992); *Or.Rev.Stat.* § 109.322 (1991). Others permit termination of parental rights when the parent's incarceration deprives the child of proper care. *E.g., Ala.Code* § 26–18–7 (1986); *Ariz.Rev.Stat.Ann.* § 8–533 (1989); *Kan.Stat.Ann.*

§ 38–1583 (1986); *Mo.Ann.Stat.* § 211.447 (1983 & Supp.1992); *N.H.Rev.Stat.Ann.* § 170–C:5 (1990 & Supp.1991); *R.I.Gen.Laws* § 15–7–7 (1988 & Supp.1991); *Wyo.Stat.* § 14–2–309 (1986). Several states, through their decisional law, have recognized that incarceration is a relevant factor bearing on parental fitness. *E.g.,* *In re Boston's Children's Servs. Ass'n,* 20 *Mass.App.Ct.* 566, 481 *N.E.2d* 516, *rev. denied,* 396 *Mass.* 1102, 484 *N.E.2d* 102 (1985); *M.L.K. v. C.B.,* 804 *S.W.2d* 398 (Mo.Ct.App.1991); *Casper v. Huber,* 85 *Nev.* 474, 456 *P.2d* 436 (1969); *In re Gregory B.,* 74 *N.Y.2d* 77, 544 *N.Y.S.2d* 535, 542 *N.E.2d* 1052 (1989); *In re Hederson,* 30 *Ohio App.*3d 187, 507 *N.E.2d* 418, 30 *OBR* 329 (1986).

Most states that by statute or decisional law consider the incarceration of a parent to be a relevant factor in a termination proceeding find that that factor has a material bearing on the capacity to care for the child. *E.g., Ala.Code* § 26–18–7 (1986) (allowing courts to consider parent's incarceration for felony when determining whether conditions that make parent unable to care for children are unlikely to be remedied in foreseeable future); *Kan.Stat.Ann.* § 38–1583 (1986) (allowing for termination of parental rights where imprisonment for felony renders parent unable to care properly for child in foreseeable future); *In re Hederson, supra,* 507 *N.E.2d* at 420 (holding that parental rights may be terminated where sole parent is to be imprisoned for up to life term, which "may be a significant factor in determining whether the parent has acted so as to leave the child without adequate parental care"); *R.I. General Laws* § 15–7–7 (1988 & Supp.1991) (allowing for termination when period of incarceration is of such duration as to render improbable that parent can care for child for extended period).

That body of statutory and decisional authority demonstrates that a parent's incarceration is considered to bear materially and directly on the parent-child relationship. Incarceration is regarded as probative of whether the parent is incapable of properly caring for the child or has abandoned the child. It is, therefore, a

factor that is unquestionably relevant to the determination of whether the parental relationship should be terminated. However, it is by no means settled or obvious that incarceration is so inimical to that relationship as to justify its termination as a matter of law.

Incarceration may be relevant to the termination of parental rights on the basis of abandonment. *See* Peter Ash and Melvin Guyer, *Involuntary Abandonment: Infants of Imprisoned Parents*, 10 *Bull.Am.Acad. Psychiatry & L.* 103 (1982) (noting that many states extend abandonment to situations, including incarceration, in which parents fail to provide for children's welfare). The trial court here concluded that H.E. should be deemed to have intended the consequences of his criminal acts. The result of H.E.'s conviction has been his extended incarceration, which has rendered him unable to render any of the "regular and expected functions of care and support of [his] child as required" by statute, *N.J.S.A.* 9:3–46a. In so ruling, the court adopted the reasoning of *In re the Adoption of a Child by Benigno–White*, 223 *N.J.Super.* 72, 78–79, 537 *A*.2d 1345 (Ch.Div.1987), in which the court held that incarceration for an extended period is tantamount to an abandonment of parental rights.

The Appellate Division also considered incarceration to be a factor probative of abandonment. 258 *N.J.Super.* at 621, 610 *A*.2d 925. The court concluded, however, that the determination of abandonment cannot be based on incarceration alone. Rather, a number of facts and circumstances must be considered to establish abandonment. *Ibid.* It held that the inquiry into whether incarceration supported a finding of abandonment as a basis for the termination of parental rights should include an evaluation of the relationship that existed between H.E. and his sons before and after the separation and the divorce. Factors to be considered should include the financial support that H.E. had contributed following the separation; the care, love, and protection that H.E. had provided; contact that had occurred before incarceration, and

the efforts at contact that had occurred during incarceration. *Ibid.*

The Appellate Division correctly recognized that incarceration can constitute evidence of abandonment, but that it must be viewed in a wider context. An incarcerated parent may be considered to have abandoned a child, depending on the nature of the contact between parent and child before and after incarceration, the efforts made by the parent to maintain contact with the child following imprisonment, and the attempts during incarceration to undertake as much responsibility for the child's welfare as possible. *E.g., Thompson v. King,* 393 *N.W.*2d 733, 735–36 (N.D. 1986) (affirming trial court's finding of abandonment based in part on imprisoned father's failure to attempt to maintain contact with child by telephone or mail and lack of awareness of son's progress or well-being); *In re Adoption of M.J.H.,* 348 *Pa.Super.* 65, 501 *A.*2d 648, 653–54 (1985) (holding that life imprisonment does not constitute abandonment if parent has made consistent efforts to maintain place of importance in child's life and to take some responsibility for the " 'composite of tasks' " associated with parenthood); *see In re Boston's Children's Servs. Ass'n, supra,* 481 *N.E.*2d at 520 (noting that although fifteen-year-minimum sentence bears on parent-child relationship because of long unavailability, termination of mother's parental rights should be reversed because mother had initially placed child with a relative, had continued to make efforts to maintain contact with her daughter, and had assisted father in regaining custody rights). We thus concur in the view expressed by the Appellate Division that incarceration is clearly a relevant factor in determining whether parental rights may be terminated on grounds of abandonment.

As earlier noted, many states consider incarceration to be a factor that impairs a parent's capacity to provide proper child care. *Supra* at 135–136, 631 *A.*2d at 932. Imprisonment necessarily limits a person's ability to perform the "regular and expected parental functions," *N.J.S.A.* 9:3–46a. Once imprisoned, a parent will have difficulty performing the "composite of tasks"

associated with parenthood and cannot continue to undertake or to share the daily responsibilities of raising a child, as one who has custody and control of the child. *See N.J.S.A.* 9:6–1 (describing neglect in terms of failure to carry out various responsibilities that ensure child's well-being). The ability to provide significant nurturing and to maintain an emotional relationship with the child, *N.J.S.A.* 9:3–46a, can be substantially constricted by the parent's imprisonment. The opportunity to give guidance, instruction, and advice is also greatly reduced. Further, the parent's incarceration may be a substantial obstacle to achieving permanency, security, and stability in the child's life. *In re Randy Scott B.,* 511 *A.*2d 450 (Me.1986). Similarly, the attempts to preserve a relationship under the circumstances of imprisonment can have a potent deleterious impact on the child's psychological and emotional well-being. *See, e.g., Casper v. Casper,* 198 *Neb.* 615, 254 *N.W.*2d 407, 409 (1977) (denying visitation with incarcerated father on basis of evidence that visitation in prison setting would be harmful to child). All of those considerations, however, are extremely fact sensitive. The parent's incarceration must be assessed in terms of whether the attempts to maintain a parent-child relationship will be harmful to the child.

In certain cases, the effects of visitation, communication, and contact with an imprisoned parent are not necessarily harmful, and can be beneficial. *See* Ann M. Stanton, *When Mothers Go to Jail* (1980); William H. Sack, *Children of Imprisoned Fathers,* 40 *Psychiatry* 163 (1977); William H. Sack et al., *The Children of Imprisoned Parents: A Psychosocial Exploration,* 46 *Am.J. of Orthopsychiatry* 618 (1976). Thus, if a child had a strong bond and loving relationship with a parent prior to incarceration, to sever all opportunities to visit or communicate with that parent might do more harm than good. *See Fusco v. Fusco,* 186 *N.J.Super.* 321, 452 *A.*2d 681 (App.Div.1982); *Frail v. Frail,* 54 *Ill.App.*3d 1013, 12 *Ill.Dec.* 680, 370 *N.E.*2d 303 (1977). Conversely, once a parent is imprisoned, a relationship with one's children that was nonexistent prior to incarceration will not likely be fostered. *See* C.S. Lanier, *Dimensions of Father–Child Interaction in a New*

*York State Prison Population*, 16 *J. of Offender Rehabilitation* 27 (1991).

We have also recognized the need for children to have permanent and stable relationships with a nurturing parent figure. *J.C.*, *supra*, 129 *N.J.* at 26, 608 *A.*2d 1312. The effect of a parent's incarceration on the permanency and stability of the child's life may be substantial. A parent's imprisonment can have a disruptive and destabilizing effect on the child's life. *See, e.g., Mo.Ann. Stat.* § 211.447 (1983 & Supp.1992) (although incarceration in and of itself shall not be grounds for termination of parental rights, conviction of felony offense that court finds is of such nature that child will be deprived of stable home for a period of years will justify termination); *N.H.Rev.Stat.Ann.* § 170–C:5 (1990) & Supp. 1991) (allowing for termination of parental rights when period of incarceration is such that child would be deprived of proper parental care and left in unstable or impermanent environment for "longer period of time than would be prudent"); *accord Ariz.Rev. Stat.Ann.* § 8–533 (1989) (allowing rights to be terminated when parent has been convicted of felony and is serving sentence of "such length that the child will be deprived of a normal home for a period of years"). Thus, the attempt of an imprisoned parent to preserve a relationship, apart from the inability to provide needed nurture on a regular and consistent basis, could undermine or destroy the stability and attachments that the child may have found with other parent-figures. *See A.W., supra*, 103 *N.J.* at 609–10, 512 *A.*2d 438. However, if the continued relationship with the natural parent is a source of needed nurture and roots, termination of that relationship may be harmful even when a new family has undertaken the custody and care of the child. *See, e.g., Adoption of D., supra*, 61 *N.J.* at 98, 293 *A.*2d 171.

Further, the emotional condition of children is extremely important in the assessment of the parent-child relationship in connection with an imprisoned parent. Visitation and contact with an imprisoned parent may generate anxiety and serious emotional upheaval or disturbance. *See In re Marriage of Brewer*, 13

*Kan.App.*2d 44, 760 *P.*2d 1225 (1988). Substantial and enduring emotional and psychological injury can constitute harm to the child warranting a finding of unfitness. *J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312; *A.W., supra,* 103 *N.J.* at 604–05, 512 *A.*2d 438. The effect of imprisonment, and the concomitant inability to carry out many regular and ordinary parental duties, can be deleterious to the emotional and psychological condition of the children.

The concern for the psychological and emotional well-being of children, in this setting, bears not only on the larger issue of parental fitness. It also implicates the nature of the underlying crime giving rise to incarceration as a factor bearing on parental capacity to provide proper care and to avoid harm to the child. The parent's criminal disposition must be assessed with respect to all of the considerations that otherwise inform the determination of parental fitness. Those include the kinds of contacts and communications between the parent and child that can be achieved; the nature of the counselling, advice, and instruction that the parent can give the child; the effects of the attempted continuation of the parental relationship on the stability and security of the child's life; and the impact of the relationship on the child's psychological and emotional well-being.

Clearly crimes of abuse against one's own children that result in substantial injury ordinarily warrant termination of parental rights. They directly violate our laws that authorize the termination of parental rights based on acts of abuse or endangerment, and are the most extreme and obvious examples of parental unfitness. *E.g., J. and E. v. M. and F.,* 157 *N.J.Super.* 478, 385 *A.*2d 240 (App.Div.1978) (ordering termination of parental rights to a child when both parents were guilty of manslaughter of another child and abuse of third child); *see also Division of Youth & Family Servs. v. V.K.,* 236 *N.J.Super.* 243, 261, 565 *A.*2d 706 (App.Div.1989) (finding that, by legislative enactment, clear and convincing evidence of defendant's sexual abuse of child pursuant to *N.J.S.A.* 9:6–1 supports termination of parental rights to that child). Other crimes, not involving the parent's direct victimiza-

tion of the child, may bear on parental unfitness and the likelihood that future harm will result to the child. *See, e.g., Fusco, supra,* 186 *N.J.Super.* at 328–29, 452 *A.*2d 681 (displaying concern that visitation of four-year-old daughter with father, convicted of brutal first-degree murder, could detrimentally affect child's well-being). Certain crimes may "unambiguously show[ ] depravity of the parent sufficient to support the conclusion he or she will probably fail to discharge parental duties toward the child." *In re Christina P.,* 175 *Cal.App.*3d 115, 134, 220 *Cal.Rptr.* 525, 535 (1985); *In re James M.,* 65 *Cal.App.*3d 254, 266, 135 *Cal.Rptr.* 222, 229 (1976); *Heath v. McGuire,* 167 *Ga.App.* 489, 306 *S.E.*2d 741, 743 (1983). Crimes may be indicative of serious personality flaws and emotional instability that are inconsistent with being a fit parent. *In re Geoffrey G.,* 98 *Cal.App.*3d 412, 159 *Cal.Rptr.* 460 (1979). Some acts of criminality leave no reasonable hope for rehabilitation; thus, behavior that could endanger the children may be likely to recur. *See, e.g., In re Sarah H.,* 106 *Cal.App.*3d 326, 165 *Cal.Rptr.* 61 (1980).

The concerns that give rise to the assessment of an imprisoned parent's criminality in relation to the harmful effects of a parental relationship on the child are present in this case. H.E.'s crime, in addition to his lengthy incarceration, is clearly relevant to the determination of whether he may be an unfit parent whose parental rights should be terminated. H.E. was found guilty of committing the brutal first-degree murder of his brother's ex-wife. H.E. had hired the killer, suggested gruesome ways of disposing of the body, and arranged other aspects of the killing and cover-up. The crime was so horrendous that he was charged and prosecuted for capital murder. The circumstances of that crime display a level of immorality and criminal disposition that would be highly relevant to the trial court's consideration of H.E.'s parental fitness. The evidence of a crime of this caliber strongly implies that rehabilitation may not be feasible or is not a realistic goal in the near future, and therefore rehabilitation may have no sensible bearing on whether a constructive parent-child relationship is possible.

Thus, in the context of this case, H.E.'s lengthy incarceration, considered together with his underlying criminality, militates powerfully against his fitness as a parent. The weight of those considerations, however, must be for the trial court to assess in determining whether the parental interest must be terminated. Because the parental interest itself is so fundamental, that determination cannot be made without a full and conscientious consideration of all relevant facts and circumstances.

## IV

We conclude that a parent's lengthy incarceration is a material factor that bears on whether parental rights should be terminated. Incarceration may be such a factor based on either abandonment or parental unfitness. Further, we conclude that the nature of the underlying crime giving rise to incarceration is relevant in determining whether parental rights should be terminated, because it may bear on parental unfitness. We also determine that the hearing to decide whether parental rights should be terminated must be based on a broad inquiry into all the circumstances bearing on incarceration and criminality, and must include an assessment of their significance in relation to abandonment or parental unfitness.

In this case, on remand, the trial court should determine whether the circumstances surrounding H.E.'s incarceration justify the termination of parental rights based either on abandonment or parental unfitness or both. It should consider evidence of H.E.'s performance as a parent before incarceration, to what extent his children were able to rely on him as a parent, and what effort, if any, he has made to remain in contact with his children since his incarceration. The court should also consider whether H.E. will be able to communicate and visit with his children; what effect such communications and visitation will have on the children in terms of fulfilling the parental responsibility to provide nurture and emotional support, to offer guidance, advice, and instruction, and to maintain an emotional relationship with his children. Fur-

ther, the court must consider the risk posed to his children by H.E.'s criminal disposition; what rehabilitation, if any, has been accomplished since H.E.'s incarceration; and the bearing of those factors on the parent-child relationship. The court should, with the aid of expert opinion, determine the need of the children for permanency and stability and whether continuation of the parent-child relationship with H.E. will undermine that need. Further, the court should determine the effect that the continuation of the parent-child relationship will have on the psychological and emotional well-being of the children.

## V

The judgment of the Appellate Division is affirmed as modified. The case is remanded.

*For modification, affirmance and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN-6.

*For reversal*—none.