# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5979-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

E.R.,

     Defendant,

and

L.N.A.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF R.J.C.,

     a Minor.

_____

Argued May 1, 2019 - Decided June 17, 2019

Before Judges Accurso, Vernoia and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0011-18.

Ryan Thomas Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan Thomas Clark, on the briefs).

Amy Melissa Young, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, on the brief).

Linda Vele Alexander, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Linda Vele Alexander, on the brief).

PER CURIAM

Defendant L.N.A. appeals from a final judgment terminating his parental rights to his son, R.J.C. (Robby), now three years old. He contends the Division of Child Protection and Permanency failed to prove the four prongs of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1) to (4) by clear and convincing evidence. The Law Guardian joins with the Division in urging we affirm the judgment. Having considered defendant's arguments in light of the record and controlling law, we affirm the termination of his parental rights.

Defendant, who has at least nine other children,[1] only two with the same woman, did not have a relationship with E.R., Robby's mother. He does not financially support any of his offspring and owes, by his own reckoning, over $140,000 in child support. His rights to three other children have already been terminated. When asked why under those circumstances he decided "to be . . . with [E.R.] in a way that there was a chance that she would have a child," defendant responded "[s]he's attractive" and he "didn't think it was going to happen like that," although acknowledging he took no steps to prevent a pregnancy.

Defendant also acknowledged he knew E.R. had a drug problem and was using when they had relations in August 2015. And although defendant was working as a drug dealer at the time, he claimed he did not supply her with drugs because "[s]he didn't need drugs from [him]" as "[s]he'd take care of herself."

Robby tested positive for cocaine at birth in May 2016. The Division removed him from E.R. in the hospital and placed him with the same resource family who was caring for, and eventually adopted, Robby's half-brother.[2] E.R.

---

[1] The Division puts the number between nine and twelve.

[2] E.R. has a long history with the Division. She does not have custody of any of her six children. E.R.'s parental rights to Robby were also terminated in this proceeding. She has not appealed.

did not identify defendant as Robby's father. She believed Robby and his half-brother were full brothers. When paternity testing proved that not the case, E.R. provided the Division with defendant's name. Defendant was confirmed to be Robby's father in October 2016. He had by then pleaded guilty to unlawful possession of a handgun and possession of heroin, for which he is now serving a five-year prison sentence with three-and-a-half years of parole ineligibility.

Because defendant was incarcerated, providing services to him was difficult. He was transferred to three different prisons during the pendency of the case and did not advise the Division of his transfers. The case worker testified he had difficulty visiting defendant at one prison, having been denied entry on at least two occasions. Defendant had no visitation with Robby, presumably because of the infant's age. The prison social workers the case worker contacted to assist in providing services to defendant during his incarceration advised defendant could not participate in necessary substance abuse evaluations and treatment owing to where he was housed. Defendant was wait-listed for several such programs. Defendant did manage to complete a job training program and a parenting program during his incarceration, and the case worker provided him pictures of Robby and gave him copies of court reports and updates. When defendant complained he was not receiving court papers,

4

the worker sent the documents certified and regular mail and hand-carried them to defendant.

Defendant's plan was to have his brother care for Robby until defendant was released from prison and could assume custody. The brother, however, visited Robby only five times over the course of seven months and had not seen him for nine months at the time of trial. When his home was declared unsuitable for placement, he advised the Division he was not interested in going through the licensing process but just wanted custody. Although advised by the case worker he would need to apply to the court for custody, the brother delayed doing so until just before trial. The Division had by that time ruled him out on a best interests basis because Robby had been with his resource parents for over a year. Although scheduled to testify at trial, the brother did not appear on the appointed day.

Dr. Linda Jeffrey conducted a psychological evaluation of defendant and bonding evaluations between Robby and defendant as well as with Robby and his resource parents. She testified defendant suffered from "a severe and chronic Adjustment Disorder," marked by a history of being unable "to make and maintain stable relationships." She found he lacked the emotional maturity "to engage in rule-governed behavior and role model rule-governed behavior" and

that his history with his other children did not suggest an understanding of basic child development or the capacity to provide a stable, safe environment for a child either physically or psychologically. Dr. Jeffrey also diagnosed defendant with a persistent depressive disorder, which she explained was a chronic depression which affects one's ability to maintain a positive emotional level and model for a child how to self-regulate and manage one's emotions.

Dr. Jeffrey also testified defendant suffered from a mixed personality disorder, including antisocial, narcissistic, borderline and dependent personality features marked by a history of antisocial behavior and a record of not "considering the consequences of his behavior for other people, including his children." She found his insight and judgment were poor and his substance abuse disorder would pose problems in caring for a child, both because of its psychoactive effects and role-modeling substance abuse. Dr. Jeffrey opined defendant's was a "very deep-seated diagnosis" that would require "a concerted effort to change behaviors, to control emotions differently, [and] to deal with issues of developmental responsibility" that would easily take two years of hard work following defendant's release from prison. She concluded defendant was "not prepared to provide a minimal level of safe parenting" to Robby at the time of trial and would not be able to do so in the foreseeable future.

6

As to the bonding evaluations, Dr. Jeffrey found no bond between defendant and Robby, as the evaluation, which took place at the courthouse, was the first time defendant had ever seen him. As a consequence, she found Robby would suffer no harm were defendant's rights terminated. In contrast, Dr. Jeffrey found Robby securely bonded to his resource parents, who described him as a loveable, pleasant and delightful child. Robby was healthy with no indication of any serious problems or developmental delays. Dr. Jeffrey observed he was relaxed and comfortable with his resource parents, offered them spontaneous affection and "was very vivacious and engaging." She opined that severing Robby's bond with his resource parents, the only parents he has ever known having been placed with them two days after his birth, would be "the worst thing that can happen" and would result in Robby suffering "long-term consequences."

Defendant testified in his own behalf. He acknowledged he has "sucked" at being a parent for his many children and "wasn't a good dad." When asked why it would be different with Robby, defendant replied that he was taking all his parenting classes and was "on it." He testified he did not want his children to "grow up and try to be drug dealers" and was motivating them by sending them letters from prison "telling them which way to go." Defendant testified he saw no harm befalling Robby from severing his ties to his resource parents,

7

"[n]one at all." He allowed that Robby "might miss the people" for "[t]hree to six months, probably" but that his brother, Robby's uncle, would be able to deal with that.

After hearing the testimony and the closing arguments of counsel, the judge placed a decision on the record terminating defendant's rights. The judge found defendant had endangered his son by not being available to care for him. Based on Dr. Jeffrey's testimony, which the judge found "very credible," the judge determined defendant lacked a realistic view of what it would take for him to abandon his former lifestyle and serve as a safe and effective parent to Robby. The judge noted defendant's utter lack of comprehension of what removing Robby from his resource parents would mean to the child. She further found defendant's plan to have his brother care for Robby until defendant's release from prison was unrealistic in light of his brother's demonstrated lack of commitment.

The judge found the Division's attempts to provide services to defendant and to arrange for visitation between defendant's brother and Robby were reasonable and that there was no basis on which the Division could have placed Robby with his uncle, the only alternative defendant suggested who was willing to assume custody. The judge found the Division had proved all four prongs of

the best interests standard, N.J.S.A. 30:4C-15.1(a)(1) to (4), by clear and convincing evidence. She found the Division was not merely relying on defendant's incarceration, see N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 556 (2014), to establish its case, and that the evidence of harm to this child from defendant's inability to act as a parent, plan for his future or mitigate the harm Robby would experience from removing him from his resource parents was overwhelming. Given the proofs, the judge had no hesitation concluding that termination of defendant's parental rights would not do more harm than good. See N.J.S.A. 30:4C-15.1(a)(4).

Defendant appeals, arguing:

> THE TRIAL COURT'S FINDINGS WERE INCOMPLETE AND INADEQUATE TO SUSTAIN A JUDGMENT TERMINATING L.N.A.'s PARENTAL RIGHTS BY CLEAR AND CONVINCING EVIDENCE AS REQUIRED BY N.J.S.A. 30:4C-15 AND 30:4C-15.1.
>
> A. The Trial Court Erred in Finding that DCPP Demonstrated by Clear and Convincing Evidence that the Son's Health and Development Had Been or Will Continue to be Endangered by the Parental Relationship under the First Prong Because it did not Prove that the Father's Incarceration Harmed R.J.C.
>
> B. The Trial Court Erred in Finding that DCPP Demonstrated by Clear and Convincing Evidence that L.N.A. was Unwilling or Unable to Eliminate the Harm Facing his Son or is Unable or Unwilling

to Provide a Safe and Stable Home for him Upon his Release from Incarceration or that Any Delay of Permanent Placement Will Add to the Harm under the Second Prong.

C. The Trial Court Erred in Finding that DCPP Demonstrated by Clear and Convincing Evidence that it has Made Reasonable Efforts to Provide Services to Help the Father Correct the Circumstances Which Led to his Son's Placement Outside the Home Because DCPP did not Prove that it Provided a Meaningful Service or a Single Visit Between the Father and Son under the Third Prong.

D. The Trial Court Erred in Finding that the Court Considered Alternatives to Termination Where DCPP Refused to Place the Son with his Uncle under the Third Prong.

E. Trial Court Erred in Finding that DCPP Demonstrated by Clear and Convincing Evidence that Termination of the Father's Parental Rights Will Not Do More Harm than Good.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012). We generally "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J.

88, 104 (2008) (quoting N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

Our review convinces us the judge's findings are amply supported by the trial testimony. Contrary to defendant's contentions, the judge did not rest her analysis on the mere fact of defendant's incarceration. Instead, the judge appropriately considered his incarceration as one of several factors in her analysis. See R.G., 217 N.J. at 556-59 (noting that incarceration, though alone insufficient grounds to terminate parental rights, is one among several factors a court may consider in a best interests analysis); In re Adoption of Children by L.A.S., 134 N.J. 127, 135-38 (1993) (same). The court was able to review defendant's long history with his other children, and how he failed utterly to act as a parent to any of them when he was not incarcerated.

Defendant never parented his son, nor any of his son's nine siblings. He never lived with the child at any point and has never even paid child support for any of his ten children. He was aware Robby's mother had a long-standing addiction problem yet did nothing to ensure the child's safety and stability. The psychological evaluation performed by Dr. Jeffrey detailed defendant's failures as a parent and the deep-seated personality issues making change both difficult and unlikely. Most striking was defendant's failure to appreciate what

11

separating Robby from his half-brother and the only parents the boy has ever known would likely mean for his son, and defendant's blithe assurance that his brother, who barely visited the child and showed no commitment to his care and well-being, could easily "deal with that."

Because this record leaves us no doubt as to the correctness of the judge's decision to terminate defendant's parental rights to Robby, we affirm the judgment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION