# RECORD IMPOUNDED

---

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5269-17T4
               A-5270-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.J.B. and A.A.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.G.B.,

     a Minor.

_____

        Submitted September 9, 2019 – Decided September 23, 2019

        Before Judges Sumners and Geiger.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0237-17.

Joseph E. Krakora, Public Defender, attorney for appellant A.J.B. (Robyn A. Veasey, Deputy Public Defender, of counsel; Patricia A. Nicholas, Assistant Deputy Public Defender, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.A. (John A. Salois, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Lisa Doreen Cerasia, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David Ben Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

A.A. (Anna)[1] and A.J.B. (Allen) appeal from an order terminating their parental rights to their daughter A.G.B. (Alexis), born October 7, 2016. For the reasons that follow, we reject the parents' respective contentions that the Division of Child Protection and Permanency (Division) failed to meet its statutory burden under each prong of the best interests test, codified at N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence.

---

[1] We use pseudonyms for the children and parents to protect their privacy and for ease of reference.

In reviewing a decision by a trial court to terminate parental rights, we give "deference to family court[s'] fact[-]finding" because of "the family courts' special jurisdiction and expertise in family matters[.]" Cesare v. Cesare, 154 N.J. 394, 413 (1998). The judge's findings of fact are not disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006).

Following a five-day trial, Judge Nora J. Grimbergen carefully reviewed the evidence presented, and thereafter concluded that the Division had met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. Her thirty-seven page written decision tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with In re Guardianship of K.H.O., 161 N.J. 337 (1999), In re Guardianship of DMH, 161 N.J. 365 (1999), and N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420 (2012), and is supported by substantial and credible evidence in the record. We therefore

affirm substantially for the reasons the judge expressed in her comprehensive and well-reasoned opinion.[2] We add the following remarks as to the application of each prong of the best interests test to Anna and Allen.

A. Prongs One and Two

As to prong one, the Division must prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 289 (2007).

"Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)). As a result, "courts must consider the potential psychological damage that may result from reunification[,] as the 'potential return of a child to a parent

_____

[2] At the end of the trial, the Law Guardian changed his position and was against the termination of parental rights. Before us, however, the Law Guardian supports the court's termination of parental rights and does not explain why he changed his position since the conclusion of the trial.

may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 605 (1986)).

"The absence of physical abuse or neglect is not conclusive." A.W., 103 N.J. at 605 (quoting In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977)). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." DMH, 161 N.J. at 379. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383.

As to prong two, the Division must prove that "[t]he parent is unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). That harm may include evidence that separating the children from their resource parents "would cause serious and enduring emotional or psychological harm." Ibid.

The Division can establish the second prong by proving that a "child will suffer substantially from a lack of stability and a permanent placement[,] and from the disruption of" a bond with the resource parents. K.H.O., 161 N.J. at

363. Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." DMH, 161 N.J. at 379.

1. Anna

Following Alexis's birth at University Hospital in October 2016, the Division received a referral from the hospital that her mother Anna admitted to smoking marijuana before learning she was pregnant but claimed she stopped thereafter. Anna also revealed that she was unemployed and homeless. She was sleeping in the living room of a friend's home and wanted to move because there were "crack bottles in the hallway."

This was not the first time the Division had been involved with Anna. The agency had contact with her when she was a child because she was in group homes, crisis units, and residential facilities. In November 2011, when she was an adult, the Division received a referral that she was smoking marijuana while caring for her children T.B., born November 8, 2007, and K.B., born July 7, 2011. Eventually, in June 2015, Anna's failure to maintain contact with the Division, her long-term unemployment, unstable housing situation, and inability to remedy her substance abuse problem resulted in the termination of her parental rights to T.B., K. B., and J.B., her son who was born in September 2013.

Two days after the Division received the hospital's referral, it obtained custody of Alexis and after her release from the hospital she was placed with a licensed resource parent J.L. (Jane), with whom she remains today. The Division subsequently provided Anna substance abuse treatment, visitation, parenting skills training, safe-house services, domestic violence education, and psychotherapy to facilitate reunification. Anna, however, failed to complete her substance abuse treatment (having numerous positive drug screens), and was non-complaint with visitation and parenting skills training.

At the time of the guardianship trial, Anna was residing at a rooming house with boarded-up windows that did not permit children. She stated she was employed, but did not provide proof of employment.

Dr. Mark Singer, Ed.D., conducted psychological and bonding evaluations of Anna. He opined that Anna was not a viable parenting option for Alexis and considering the "length of time she has had to make improvements in her life . . . [she] is not likely to become a viable parenting option . . . in the foreseeable future." Dr. Singer also expressed concern with Anna's history of homelessness, substance abuse, failure to cooperate with the Division, and termination of her parental rights to her three older children. In particular, he noted Anna had been

unable to remedy her substance abuse, despite having participated in multiple programs, or to parent her older children.

In her decision, Judge Grimbergen recognized that, despite the prior termination of her parental rights to her three older children, Anna continued her pattern of unstable housing, substance abuse and noncompliance with services. The judge determined the Division had offered services to Anna, which she was unwilling to meaningfully participate in or benefit from. She was also unable to maintain stable housing. Even if Anna were to comply with Dialectical Behavior Therapy (DBT) due to her complex trauma, as suggested by her psychological and bonding expert, Dr. Aida Ismael Lennon, Psy.D., the judge reasoned it was a lengthy process that would further delay Alexis's need for permanency in the uncertain hope that Anna would eventually stabilize. Consequently, the judge found there was clear and convincing evidence that Anna's behavior threatened Alexis's safety, health, and development, and because her behavior would continue, it was not in Alexis's best interests if reunification occurred.

Anna contends she did not harm Alexis and the record does not establish the Division demonstrated by clear and convincing evidence that she did so as required by the first prong. She maintains the State failed to satisfy its obligation

to provide her with "[e]mergency maintenance service" including "the provision of food, clothing, shelter, furniture, appliances and similar necessities, needed by a client in a crisis, and not available elsewhere." N.J.A.C. 10:133-1.3. She further maintains the Division's removal of Alexis was improperly based on the prior termination of her parental rights to her three older children.

Based on the judge's credibility findings, there is clear and convincing evidence to support the judge's finding that Anna's parental relationship would harm Alexis based on Anna's history of being unable to provide a safe home that would enable her to properly nurture and care for her daughter. Given that Anna's parental rights with her three older children were terminated prior to Alexis's birth, Anna was made fully aware of what she needed to do to be reunited with Alexis. Nevertheless, she was unable to get her life together, and because the Division established that she lacked the capacity or willingness to properly parent Alexis, we conclude the judge properly considered the prior termination of Anna's parental rights with respect to her three older children.

2. Allen

Shortly after the Division filed for guardianship of Alexis in August 2017, Allen was charged with robbery and incarcerated at Essex County Correctional Facility (ECCF). He remained incarcerated at the time of the trial.

A Division caseworker met with Allen several times at ECCF offering him services, but he said he did not need them. Allen was provided with visitation while incarcerated at ECCF. He was appropriate with Alexis during visits and even though Alexis frequently cried, she eventually would warm up to Allen. Prior to his incarceration, Allen had followed through with Division arranged visits in October 2016 through December 2016, but had not seen Alexis until July 2017 just before he became incarcerated.

During a psychological evaluation with Dr. Singer at ECCF, Allen refused to describe his relationship with Alexis or Anna, and refused to discuss his substance abuse history. Allen did admit to having been arrested "a lot." He had no idea of his release date from ECCF and could not articulate his post-release plans or any plan for parenting Alexis. Dr. Singer thus opined that Allen was not in a position to parent and was unlikely to become a viable parenting option for Alexis within the foreseeable future. Dr. Singer found his lack of any articulable plan for himself or Alexis upon his release "highly problematic." Dr. Singer determined that Alexis viewed Allen as a "source of anxiety," not security.

In assessing prongs one and two, Judge Grimbergen determined Allen was unfit to parent based upon his refusal to: provide any information to the Division

and Dr. Singer; accept the services offered by the Division; engage in consistent visitation; maintain contact with the Division prior to his incarceration; and provide a plan for Alexis. As with Anna, the judge decided that Alexis's permanency should not be further delayed "in the hope" that Allen would stabilize in the future.

Allen argues the judge used his incarceration as the sole factor to terminate his rights, without the requisite broad inquiry into its impact and relationship to the four prongs of the test. In re Adoption of Children by L.A.S., 134 N.J. 127, 137-38 (1993). He claims the Division presented no evidence related to whether his incarceration would be detrimental to the parent-child relationship, or that the Division proved he abused and neglected Alexis. Ibid. See L.A.S., 134 N.J. at 137-38. He further contends the entire guardianship proceeding was about the prior terminations of Anna's parental rights because the judge's analysis of him was "clearly an afterthought to [Anna]." Allen concedes he did not want to participate in services with the Division unless housing was offered, but claims he continued to visit Alexis.

We agree with Allen that incarceration is probative of abandonment but does not justify termination as a matter of law. Id. at 137. "[I]ncarceration alone—without particularized evidence of how a parent's incarceration affects

each prong of the [best interests of the child] standard—is an insufficient basis for terminating parental rights." N.J. Div. of Youth & Family Services v. R.G., 217 N.J. 527, 556 (2014). Thus, when determining whether incarceration constitutes abandonment, courts should consider the "nature of the contact between parent and child before and after incarceration, the efforts made by the parent to maintain contact with the child following imprisonment, and the attempts during incarceration to undertake as much responsibility for the child's welfare as possible." L.A.S., 134 N.J. at 138.

Allen's incarceration is certainly probative of his inability to prevent further harm to his daughter, and is also probative of his unwillingness to care for her. That said, it was not the sole factor relied upon by the judge to find that the Division satisfied prongs one and two.

Since the beginning of the litigation, Allen refused to provide any information about himself or his address. He refused to engage in services, did not maintain contact with the Division, did not visit Alexis from December 2016 to August 2017, and did not participate in any court hearings. While incarcerated Allen refused services offered by the Division and did not cooperate with Dr. Singer's psychological evaluation. Moreover, Allen had no definitive plans that were indicative of his ability to create a stable household.

Allen is correct that most of the guardianship trial involved Anna's conduct. This, however, is because the Division had significantly more dealings with her than with Allen, who refused to cooperate with the Division. Under these circumstances, it is speculative at best to expect Allen to improve his lifestyle in such a way that he would be able to properly parent his daughter and remedy the harm facing her in the long term.

B. Prong Three

As to prong three, the Division is required to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,] and the court [will] consider[] alternatives to termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3). This prong "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354. "Reasonable efforts" include, but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with the [reasonable] efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court[.]" DMH, 161 N.J. at 390.

The Division

must encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family. [It] must promote and assist in visitation and keep the parent informed of the child's progress in foster care. [It] should also inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that relationship and, eventually, to become an effective caretaker and regain custody of his or her children.

[Id. at 390 (citing N.J.S.A. 30:4C-15.1(c)).]

A court is required to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011). The Division must assess each interested relative and, if it determines the

relative is unable or unwilling to care for the child, inform them of its reasons for a denial of placement. N.J.S.A. 30:4C-12.1(a)-(b).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Family Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). "The Division's statutory obligation does not permit willful blindness and inexplicable delay in assessing and approving or disapproving a relative known to the Division[.]" K.L.W., 419 N.J. Super. at 582. It cannot ignore relatives "based upon an arbitrary, preordained preference for the foster placement" and "must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

1. Anna

As mentioned above, the Division offered a multitude of services and programs to Anna to address her individualized needs to obtain reunification with Alexis but she either failed to participate in the services or successfully complete the programs.

As for considering alternatives to termination of parental rights, the Division considered options that proved to be futile. E.B., Anna's sister's adoptive parent offered to serve as a resource parent for Alexis, but her license had been revoked. E.B. did not appeal the ruling. Anna offered a relative, P.H.,[3] who lived in Baltimore, as a potential placement. Yet, Anna did not provide P.H.'s phone number or address, therefore the Division was unable to locate or assess her.

Allen's adult son, A.D., was offered to take custody of Alexis but was ruled out by the Division because he only wanted to babysit. He did not appeal the ruling. Allen's former girlfriend K.E. made an interstate application but was ruled out because she was not a United States citizen.

The judge found the proofs were clear and convincing that the Division made "reasonable efforts to help [Anna] . . . correct the circumstances that led to [Alexis's] removal including psychological evaluations, domestic violence liaison, substance abuse assessment and treatment, visitation, and case plans. However, [she] continued to make no meaningful effort to engage in services." The judge noted that the services to facilitate Alexis's reunification were provided to Anna even though the Division did not have to do so "based on her

---

[3] Her relationship to Anna is not in the record.

prior termination of parental rights to her older children." The judge also found Dr. Lennon's opinion that Anna should have been allowed to revive DBT was not credible because it was speculative to conclude that the therapy would give Anna the ability to complete the necessary services to make her a fit parent. Further, the judge held there were no available options to place Alexis with a relative as the proposed relatives were ruled out.

Anna contends the Division failed to offer the proper services to address her specific needs to promote reunification. She asserts the quick dismissal given to her family members, violated her right to reunification and therefore could not satisfy the N.J.S.A. 30:4C-15.1(a)(3) requirement that alternatives to termination be considered. We disagree.

We conclude that substantial credible evidence exists to support the judge's findings that the Division made reasonable efforts to provide services to help Anna correct the circumstances that led to termination of her parental rights to Alexis. In addition, the record clearly supports the judge's determination that there were no alternatives to termination of parental rights, such as placement with relatives.

17

2. <u>Allen</u>

As with Anna, the Division offered services to Allen to address his individualized needs to obtain reunification but he refused to cooperate. Moreover, as mentioned, the Division considered placing Alexis with relatives to avoid termination of parental rights. Accordingly, the judge found there was no basis for finding that the Division neglected its responsibility to offer services to Allen.

Allen argues he did not "adamantly say" he would not participate in services. He admits, though, that he did reiterate time and again that he would not participate in services unless the Division helped him with independent housing, which was supposedly the reason Alexis was removed from his and Anna's care. Allen contends he offered two relatives for placement, but the judge failed to consider alternatives to termination of parental rights. Allen asserts his ex-girlfriend was a citizen and contacted the Division to inform it that she was just waiting for the paperwork and still wanted to be a resource parent for Alexis.

We discern no reason to disagree with the judge's finding that the Division satisfied prong three as to Allen. There is no merit to his contentions that he did

not refuse services and there were reasonable alternatives to termination of parental rights.

C. Prong Four

Under prong four, the Division must demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The prong focuses on the important consideration of a child's need for permanency. M.M., 189 N.J. at 281. "The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355. In order to weigh any potential harm from terminating parental rights against a child's separation from his or her foster parents, a court must consider expert testimony on the strength of each relationship. J.C., 129 N.J. at 25. "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

Alexis has lived with Jane since her release from the hospital, almost two years before the guardianship trial, and knows no other caretaker. Dr. Singer

conducted bonding evaluations between Alexis and Anna, Alexis and Allen, and Alexis and Jane. He concluded that while Alexis has developed a meaningful relationship with Anna, the data suggests that Anna lacks the emotional and physical resources to mitigate such harm. Dr. Singer further stated that the data did not suggest that a loss of the relationship with Anna would result in significant and enduring harm, but in actuality, the harm experienced through the loss of the relationship between Alexis and Jane would be more intense and more significant than the loss of the relationship between Anna and Alexis.

He opined that Alexis viewed Allen as a source of anxiety as she cried when Allen took the child away from the Division's staff. Dr. Singer opined that Alexis would not experience severe and enduring harm from the termination of her relationship with her biological parents. As for Jane, Dr. Singer opined that she is Alexis's psychological parent and that Alexis would suffer harm if separated from Jane, which Allen would not be able to mitigate. Although Jane wanted to adopt Alexis, she would permit contact between Alexis and both birth parents, even though Allen was incarcerated.

Anna's bonding expert, Dr. Lennon conducted bonding evaluations of Anna and Alexis, and Jane and Alexis. Dr. Lennon concluded that Anna had a more positive relationship with Alexis than Jane. She believed Alexis was not

"strongly" attached to either Anna or Jane. She further opined that Alexis was comfortable with Anna and Anna was "very loving" toward Alexis. According to Dr. Lennon, Alexis was comfortable with Jane, but Jane was not as engaged as Anna was with Alexis. Dr. Lennon concluded that "[t]he court might want to reconsider pursuing the termination of [Anna's] parental rights and allow her an opportunity to engage in appropriate services."

Judge Grimbergen found that "[b]ased upon Dr. Singer's expert opinion and competent evidence in the record," there was clear and convincing evidence "that terminating [Anna and Allen's] parental rights to [Alexis] would not do more harm than good." She found that Dr. Lennon's conclusion that Jane's attachment to Alexis was "weak" was not supported by "any competent evidence or explanation." The judge recognized Alexis was young, but found the evidence shows that Anna "lacks the resources to provide stability to" Alexis. As for Allen, there was no expert opinion contradicting Dr. Singer's assessment that he would not be "a viable parenting option for [Alexis] within the foreseeable future."

1. Anna

Anna stresses that she was denied the chance to bond with Alexis since she was removed from her at birth. She contends the judge imposed a higher

A-5269-17T4

standard on her than required under N.J.S.A. 30:4C-15.1(a).  She asserts the correct legal analysis must compare a child's future with a parent and one without a parent.  K.L.W., 419 N.J. Super. at 575.  She contends "all doubts are to be resolved against [the] destruction" of the parent-child relationships in this family.  In re Adoption of Children, 96 N.J. Super. 415, 425 (App. Div. 1967).  She further asserts the judge's assessment of the proceeding required an appreciation of the litigation's circumstances and the impediments "orchestrated by [the Division] that caused the foster[] [parent's] relationship to damage Anna's relationship with [Alexis]."

We conclude the record supports the judge's determination that the Division proved by clear and convincing evidence that terminating Anna's parental rights would not do more harm than good to Alexis.  We see no error in the judge's reasoning to credit Dr. Singer's opinion that Anna would not be able to mitigate the harm if Alexis was removed from Jane's custody, which conflicted with Dr. Lennon's opinion.

2. Allen

Allen asserts the termination of his parental rights was premature.  He contends the Law Guardian began the trial supporting termination of parental rights but after listening to all the evidence, including Dr. Singer and Dr.

Lennon, changed his position and told the court he was no longer supporting termination of parental rights. Allen admits that while it is true Dr. Singer did not feel he was a viable parenting option for Alexis and that she has not come to see him as a significant parenting figure in her life, he stresses his plan for Alexis was not to be with him, but for her to either be with his family or Anna. We are unpersuaded.

Allen's reliance on Anna or a family member to have custody of Alexis evades the uncontroverted opinion by Dr. Singer that termination of his parental rights to Alexis would not do more harm than good. Thus, we see no error in the judge's reasoning to credit Dr. Singer's opinion that Allen would not be able to mitigate the harm if Alexis was removed from Jane's custody. It is obvious to us that terminating Allen's parental rights would do no harm and, in fact, was good for Alexis.

In sum, we conclude the termination of Anna and Allen's parental rights was in Alexis's best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5269-17T4