# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4636-18T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

A.C.J.,

     Defendant,

and

E.J.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.Z.J.,

     A Minor.

_____

       Argued telephonically April 27, 2020 –
       Decided May 22, 2020

       Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0055-19.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Ryan T. Clark, on the briefs).

Sara K. Bennett, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Sara K. Bennett, on the brief).

Lynn B. Norcia, Designated Counsel, argued the cause for minor L.Z.J. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Lynn B. Norcia, on the brief).

PER CURIAM

After a two-day Title 30 guardianship trial, the Family Part issued a lengthy written decision in July 2019 terminating the parental rights of the mother, A.C.J., and the father, E.J., to their son L.Z.J.[1]

The father now appeals, contending the Division of Child Protection and Permanency ("the Division"), failed to meet its burden of proving all four required elements of N.J.S.A. 30:4C-15.1 by clear and convincing evidence. The mother has

---

[1]  We use initials for the parties and other individuals as necessary to protect the child's privacy. R. 1:38-3(d)(11).

not appealed. The Law Guardian joins with the Division in opposing the father's appeal. We affirm, substantially for the sound reasons comprehensively expressed in the seventy-three-page written opinion of Judge James R. Paganelli, who presided over the trial.

I.

The child was born in August 2017. He is presently two years and nine months old. He was removed from the hospital by the Division at the time of his birth on an emergency basis because of his parents' mental health problems, drug abuse, homelessness and other issues.

As the record reflects, the mother has severe and unremitting mental health and drug abuse issues. She has two older children with different fathers who she has been unable to care for, including the son's half-sister as to whom the mother has surrendered her parental rights.

As the record also reflects, the father has a long history of adult criminal and juvenile offenses. He has spent much of his life incarcerated. The father was jailed in March 2018, about seven months after the son was born. He was charged with and convicted of third-degree theft and sentenced to prison at Mid-State Correctional Facility. As of the time of the May 2019 guardianship trial, the father was expected to be fully released some time in 2020.

A-4636-18T3

The father has been diagnosed with mental health issues, including major depressive disorder, anxiety disorder, impulse control disorder, and bipolar disorder. Like the mother, the father has a history of drug abuse and homelessness. He has no stable employment history.

The son has never lived in the same household as the father. Before the father's most recent imprisonment, the Division arranged supervised visits for the father with his son. However, the father missed many of the visits, which he blamed on the lack of phone service. He only managed to make seven visits during that seven-month period.

The Division initially placed the son with a cousin of the mother, L.H., where his half-sister also is residing. After the Division received a report of possible sexual abuse by another adult residing at L.H.'s home, it transferred the son to a different resource home of a non-relative, M.P. The charges of abuse were not substantiated, and the son was returned to L.H.'s care in December 2019, post-trial.[2] Both L.H. and M.P. have expressed an interest in adopting him.

---

[2] We appropriately learned about the son's change in placement back to L.H. through a letter from the Division's appellate counsel pursuant to Rule 2:6-11(f). We appreciate the attentiveness of counsel in updating us and other counsel about the child's status while the appeal was pending.

The father participated in numerous re-entry and drug rehabilitation programs while in prison. He has expressed a strong desire to care for his son after he is released, and his life stabilizes. Pursuant to an order of the Family Part, the Division provided him with monthly visits with the son at the prison.

The Division's psychological expert, Dr. Eric Kirschner, performed bonding evaluations of the son with the two respective resource parents, and did the same with the father. The expert found evidence of the child's attachment with both resource parents but less so with the father. The expert acknowledged, however, the child was very young and would be expected to form stronger attachments as he got older.

There are no other identified relatives of the child, except for L.H., who showed promise as an alternative caretaker. A related grandmother suggested by the father was ruled out because of previous unrelated abuse allegations.

At trial the Division presented three witnesses: Dr. Kirschner, another psychologist named Dr. Jonathan H. Mack, and a caseworker. Dr. Kirschner and the caseworker provided testimony with respect to both the mother and the father. Dr. Mack's testimony only concerned the mother, and we need not discuss it here.

The judge found the testimony of both Dr. Kirschner and the caseworker to be credible. As to Dr. Kirschner, the judge found he presented "credible and

uncontroverted testimony that [the son's] safety, health or development has been or will continue to be endangered by the parental relationship with [the father]." The judge also noted the psychologist's testimony was "direct, informative, and tethered to the factual presentations of [the father]." Further, Dr. Kirschner "made eye contact with questioners, answered all questions in a straightforward manner, and was not defensive."

Similarly, the judge found the caseworker's testimony was "direct and insightful." He added, "She was fully conversant with the facts and circumstances surrounding the family. She was not defensive and seemed to want to provide the court with an honest and reasonable assessment of the family."

The father testified in his own behalf. By contrast to the testimony of the Division's witnesses, the judge did not find the father credible. The judge was particularly unpersuaded by the father's belief that he could become a capable caretaker if he were given about a year to stabilize his life after his release from prison.

The father did not present a competing expert or any other witnesses. The Law Guardian did not call any witnesses.

After considering the evidence, the judge determined that the Division had established, by clear and convincing evidence, all four prongs of the Title 30 criteria for the termination of parental rights. Those well-established statutory prongs are:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) [The Division] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside of the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four controlling standards later codified in Title 30).]

In analyzing these Title 30 factors, the trial judge devoted close attention to the father's argument that his rights as a parent should not be terminated simply because of his incarcerated status. The judge was guided in this regard by the

7

Supreme Court's opinions on the subject in In re Adoption of Children by L.A.S., 134 N.J. 127, 143 (1993); as later amplified in N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 556 (2014).

As the Court stated in R.G., "incarceration alone—without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard—is an insufficient basis for terminating parental rights." 217 N.J. at 556. Even so, the Court also recognized that "incarceration is a relevant factor in resolving termination of parental rights cases." Id. at 555.

In L.A.S., the Court remanded a guardianship case for the trial court to reconsider whether the defendant father's incarceration was sufficient to terminate his parental rights, "based on either abandonment, parental unfitness, or both." 134 N.J. at 143. In so doing, the Court in L.A.S. instructed trial courts in imprisoned parent cases to take into account the following considerations, which were later reiterated in R.G.:

> [P]erformance as a parent before incarceration, [and] to what extent his children were able to rely on him as a parent;
>
> [W]hat effort, if any, he has made to remain in contact with his children since his incarceration;
>
> [W]hether he will be able to communicate and visit with his children;

[W]hat effect such communications and visitation will have on the children in terms of fulfilling the parental responsibility to provide nature and emotional support, to offer guidance, advice, and instruction, and to maintain an emotional relationship with his children;

[T]he risk posed to his children by [the parent]'s criminal disposition;

[W]hat rehabilitation, if any, has been accomplished since [the parent]'s incarceration, and the bearing of those factors on the parent-child relationship

[W]ith the aid of expert opinion, determine the need of the children for permanency and stability and whether continuation of the parent-child relationship with [the parent] will undermine that need; and

[D]etermine the effect that the continuation of the parent-child relationship will have on the psychological and emotional well-being of the children.

[R.G., 217 N.J. at 555-56 (quoting L.A.S., 134 N.J. at 143-44).]

The trial judge in the present case acknowledged that incarceration alone, without particularized evidence of how it affects the child, is an insufficient basis for terminating parental rights. The judge accordingly conducted a meticulous analysis of the pertinent considerations under L.A.S. and R.G.

As to the first L.A.S. consideration—past parental performance—the judge noted that the father has never parented or lived with the son. The father was taken into custody when the son was seven months old, and he was still in

9                                                              A-4636-18T3

prison at the time of the judge's opinion. The father acknowledged using drugs, including cocaine, just prior to his arrest in March 2018.

Moreover, the Division observed the father's unfamiliarity with children during the pre-incarceration visits, including times when the father held the son awkwardly, and told him to "shut up." The judge did recognize that some of those visits "appeared to be positive." Nonetheless, he found the first L.A.S. factor supported termination of parental rights.

The judge next analyzed under L.A.S. "[w]hether [the father] will be able to communicate and visit with [the son], what effect such communications and visitation will have on [the son] in terms of fulfilling parental responsibility to provide nurture and emotional support, to offer guidance[,] advice, and instruction, and to maintain an emotional relationship with [the son]." The judge found that because of the son's age, "meaningful communication [was] not possible while [the father was] incarcerated."

Even assuming the fathers anticipated release to a halfway house, the judge noted the son's contact with the father will continue to be limited "for a minimum of six months." The judge found the father "will not be in a position to fulfill his parental responsibility to provide nature and emotional support, to offer guidance, advice and instruction and maintain an emotional relationship."

 A-4636-18T3

The judge also found under <u>L.A.S.</u> that consideration of the risks to the child weighed against the father. He noted the father's extensive criminal history, citing Dr. Kirschner's expert opinion that "the best predictor of future behavior is past behavior." As the judge observed, the father's legal sanctions and confinements have had "minimal" effect on his behavior, and therefore there has been "no meaningful rehabilitation."

Further, the judge expressed concern that the need for the father to enroll in a halfway house for a minimum of six months, attain sobriety, employment, and housing, could "strand the son in state foster care for at least the next year."

The judge next analyzed under <u>L.A.S.</u> the son's need for permanency and stability, and whether the father's continued parent-child relationship would undermine that need. The judge adopted Dr. Kirschner's credible expert opinion that the father does not provide the son with permanency, and that "lack of permanency leaves the child in a state of limbo where they could be removed and placed somewhere else at any time." The judge reasoned this lack of permanency negatively affect the child's self-esteem and emotional stability. The judge therefore found this consideration under <u>L.A.S.</u> likewise supported termination.

A-4636-18T3

Lastly, the judge applied L.A.S. and considered the effect that the continuation of the parent-child relationship would have on the psychological and emotional well-being of the son. The judge noted that the son had been in placement for nearly two years as of the time of trial. The judge further noted that Dr. Kirschner's "uncontroverted and credible opinion is that stranding [the son] in foster care for at least another . . . year is not in his best interests and could lead to developmental difficulties and problems with self-regulation."

After reflecting upon these considerations in accordance with L.A.S. and R.G., the judge concluded by clear and convincing evidence that the son's "safety, health or development has been and will continue to be endangered by the parental relationship with [the father]." This finding satisfied what is known as prong one of the Title 30 criteria, N.J.S.A. 30:4C-15.1(a)(1).

Moving on, the judge further concluded that the Division had met its burden of proof as to the remaining prongs of the Title 30 analysis.

As to prong two, the judge accepted Dr. Kirschner's expert assessment that the father "would need an additional six to nine/twelve months to establish communal sobriety," and also would need time to attain employment and suitable housing. The judge "did not discount" the fact that the father has participated in several programs in prison. However, the judge found those

12

programs "fall short of transitioning [him] into society and transforming him into a minimally effective parent."

The judge also found that delay in permanency would add to the son's harm. In light of these and other pertinent facts, the judge was satisfied that prong two under Title 30, N.J.S.A. 30:4C-15.1(a)(2), had been established.

With respect to prong three, N.J.S.A. 30:4C-15.1(a)(3), the judge duly considered whether the Division proved it had "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." The judge also addressed whether "alternatives to termination of parental rights" had been sufficiently explored. Ibid. The judge detailed in his written opinion why the Division had met its burden on these prong three factors.

As to services, the judge recited in his opinion a host of services that the Division provided (or attempted to provide) to the father, both before and during his incarceration. Among other things, the judge noted the substantial efforts the Division had made in arranging visits. As the judge recognized, the father failed to confirm many visits before being incarcerated, which was required by court order, so that the Division did not needlessly transport the son back and forth to appointments. On many occasions, the Division unsuccessfully

13

attempted to contact the father at various phone numbers he provided to confirm the appointments. Post-incarceration, the Division arranged monthly visits between the father and the son at Mid-State, despite the substantial distance and travel time from North Jersey involved.

The judge also found the Division made reasonable efforts to reunify the father with his son, including: providing psychological evaluations, transportation, substance abuse assessment, family placement assessments, family team meetings, bonding evaluations, and the aforementioned visitation.

Turning to the other aspect of statutory prong three, the judge considered alternatives to parental termination, including relative placement, kinship legal guardianship ("KLG"), independent living, and long-term specialized care. The father suggested his own mother for a placement assessment. However, she was a "substantiated" perpetrator, and therefore, the Division could not place the child with her. The Division was willing to assess other named relatives and persons, but it was not provided with sufficient contact information for any of them.

A-4636-18T3

The judge also considered KLG, but this was not an option because L.H. and M.P. each expressed a willingness to adopt the child.[3] The judge found that such adoption was likely and feasible.

The judge also considered the possibility of independent living, but this was not viable because the son was not yet two years old. The judge also found that long-term specialized care was likewise not feasible because the child is not disabled.

For these and other reasons detailed in his opinion, the judge found the Division had met its burden on statutory prong three.

Lastly, the judge was convinced the Division had sustained its burden under prong four, known as the "best interests" standard, N.J.S.A. 30:4C-15.1(a)(4). This prong operates as a "fail-safe against termination even when the remaining standards are met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The court examines under this prong whether

---

[3] The Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7, which authorizes KLG, was enacted because "the Legislature recognized than an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

terminating parental ties will be more harmful to the child than beneficial. In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999).

The judge cited numerous reasons in his opinion why the Division had shown that terminating the father's parental rights would be less harmful than continuing to delay the child's permanency. Among other things, the judge underscored Dr. Kirschner's testimony that the son had formed bonds with both L.H. and M.P. Conversely, the child had not formed a strong bond with the father.

The judge reasoned that the child would not experience serious or enduring psychological harm if his relationship with the father were severed. Moreover, even if the child were to experience harm by severing his relationship with the father, Dr. Kirschner predicted that harm could be mitigated by being cared for by either L.H. or M.P.

In addition, the judge focused on "Dr. Kirschner's uncontroverted and credible opinion . . . that [the child] requires and has a right to permanency," and the father does not provide the son with such permanency. Further, "there is no indication that [the father] . . . ha[s] any ability to care for [the son] in the foreseeable future." On this point, the judge found persuasive Dr. Kirschner's

testimony that the father was unable to provide the son with appropriate care, or meet his basic needs.

II.

This appeal by the father ensued. As we have already mentioned, the father challenges the trial court's findings on all four of the statutory criteria. He especially focuses on prong three, contending the Division should have provided more services to him while he has been incarcerated. In this regard, the father asserts that the Division institutionally underfunds such services to incarcerated parents, relies too much upon programs supplied by correctional facilities, and should arrange for more outside service providers to come to the prisons.

The father also contends that, under prong four, the change in the child's placement to L.H. reported in December 2019 renders the trial court's "best interests" findings obsolete. He asserts that the caseworker's records suggest that L.H. is not willing to adopt the child. The father advocates that, at a minimum, the case should be remanded for further hearings.

We reject these contentions, and the other arguments presented on appeal. Instead, we affirm the final judgment of guardianship, substantially for the comprehensive reasons set forth in Judge Paganelli's extensive opinion.

17

Our review of this appeal is guided by well-settled standards for termination cases. In such cases, the trial court's findings generally should be upheld so long as they are supported by "adequate, substantial, and credible evidence." R.G., 217 N.J. at 552. A decision in this context should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004).

We must give substantial deference to the trial judge's opportunity to have observed the witnesses first-hand and to evaluate their credibility. R.G., 217 N.J. at 552. We also must recognize the considerable expertise of the Family Part, which adjudicates a large volume of cases brought by the Division under Title 9 and Title 30 involving the alleged abuse or neglect of children. See, e.g., N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 448 (App. Div. 2019). That said, we apply de novo review to the Family Part judge's rulings on pure questions of law. R.G., 217 N.J. at 552.

Little needs to be said here about the trial judge's findings of past and future harm to the child under prongs one and two. As we have already mentioned, the judge carefully described and considered the circumstances that

resulted in the child's plight, and the unlikelihood that his father would be able to provide a stable home for him in the near future. The judge adhered to the principles of L.A.S. and R.G., and did not rule against the father solely because of his incarcerated status.

Turning to prong three, we are satisfied the judge had ample credible evidence in the record to conclude that the Division made reasonable efforts to provide services to the father, and reasonably explored alternatives to termination.

The monthly visits arranged at the prison, which required this young child to be driven there from a substantial distance, bespeak reasonable efforts by the Division to foster a father-son relationship that might enable reunification. We recognize the Division delayed several months in following through on certain recommendations for services, but it appears from the record the services were ultimately provided substantially in accordance with those recommendations.

We discern nothing unreasonable about the Division not duplicating instruction and counseling already provided within the prison by the Department of Corrections. To be sure, more services might theoretically be beneficial to imprisoned parents and their children, but those programmatic choices, and their budgetary impacts, are best considered on a broader scale by policymakers. In

any event, on this record, we cannot conclude that the judge misapplied the law in rejecting the father's claim he had been given short shrift.

We are also satisfied that the court gave due consideration to alternatives to termination. Apart from the resource parents, no other viable relatives were located. The Division undertook reasonable steps to find other possible caretakers.

Also, the judge did not err in finding that KLG is not an option. The father asserts that L.H., the son's present resource parent, is not willing to adopt him, citing a Division contact sheet from July 2, 2018. However, that contact sheet appears to be about communications the caseworker had with M.P., not L.H. In any event, the entry goes on to say that, when asked about a perception that she did not wish to adopt, M.P. said such a perception would be "a lie." Moreover, closer to the time of trial, both L. H. and M. P. told Dr. Kirschner during their bonding evaluations they were willing to adopt the child.

As to prong four, we have no reason to second-guess the judge's first-hand assessment that termination would do more harm to the child than good. The judge's assessment is supported by the unrefuted opinions of the only relevant testifying expert, Dr. Kirschner, who the judge found credible. The child is now placed in a home with his half-sibling, which can be beneficial. See In re D.C.,

20

203 N.J. 545, 563-66 (2010) (finding as a matter of general policy, the Family Part strives to place siblings and half-siblings in the same household when feasible and in the children's best interests). The bonding evaluation revealed that the relative resource parent has developed a good relationship with the child.

We see no sensible reason to remand the case for more proceedings because of the recent change in placement back to L.H. The judge's opinion found that placement with either L.H. or M.P. would be beneficial and in the child's best interests, as compared with a speculative placement with the father many months after his release from prison. The child's interests in permanency weigh against prolonging this litigation any further. L.A.S., 134 N.J. at 143-44.

All other points raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). Although we respect the father's constitutional rights, and his professed desire to parent, the trial evidence provides an ample basis for the final judgment of termination.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4636-18T3