# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1080-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.D.,

     Defendant,

and

T.S.G.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
V.I.D., a minor.

_____

Submitted September 14, 2022 – Decided October 24, 2022

Before Judges Accurso, Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0059-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Bruce P. Lee, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant T.S.G., who is incarcerated at Trenton State Prison and represented himself at the guardianship trial with stand-by counsel from the Office of Parental Representation, appeals from a final order terminating his parental rights to his now four-and-a-half-year-old son, V.I.D. (Victor), whom he has never met.[1] Defendant contends four errors warrant reversal, the first three as a matter of law: 1) the resource parents' faulty understanding of the differences between kinship legal guardianship and adoption; 2) the court's

---

[1] This name is fictitious to protect the child's identity. See R. 1:38-3(d)(12).

A-1080-21

abuse of discretion in allowing him to represent himself, which defendant contends deprived him of his right to counsel; 3) the court's reliance on the opinion of an expert who administered an I.Q. test to defendant "for no reason but to show [defendant] was a black man with below average intelligence, which evokes a racial trope" with "historical underpinnings"; and 4) the Division of Child Protection and Permanency's failure to make reasonable efforts to arrange visitation between defendant and Victor, leaving it unable to establish the third prong of the best interests standard, N.J.S.A. 30:4C-15.1(a)(3). The law guardian joins with the Division in urging affirmance. Unpersuaded by defendant's arguments, we affirm.

The facts are uncontested. Victor, his mother D.D.'s sixth child, was born with cocaine and opiates in his system. He was removed from her care as soon as doctors could wean him off the drugs and placed with a non-relative resource family. Only after the abuse and neglect litigation had been pending for over a year, and the paternity tests of two other men ruled them out as Victor's father, did D.D. suggest defendant should receive a paternity test. The Division located defendant in the State prison system, where he had been since

3

before Victor's birth.[2] Defendant told the worker he sold drugs to D.D. and had let her stay with him for a couple of weeks before he was incarcerated. He was willing to take a paternity test and happy when he learned it was positive.[3] Victor was by then fifteen months old, and the Division had already filed its guardianship complaint.

The Division amended its complaint to include defendant, and he was assigned counsel in August 2019 at the first case management conference following his joinder. Defendant asked that the baby be cared for by his family, specifically his niece, until his release, which he expected to be soon.[4]

---

[2] Although defendant was in the State prison system, he was considered an Atlantic County inmate until his sentencing in July 2020. He declined to explain why he was moved to a State prison while awaiting trial, telling the State's expert only that "[t]hey thought I was involved in something." Defendant advised he was not eligible for programs in the State prison where he was housed because he was a county inmate.

[3] Defendant has a daughter, now fifteen, who lives with her mother. Victor is his only other child.

[4] Defendant advised the worker he was facing multiple drug distribution related charges but hoped for "a plea deal to time served."

The Division accordingly began the process of exploring the change in Victor's placement.[5]

In November, the Division's expert Dr. Brandwein endorsed the move to defendant's niece, and the Division, the law guardian and defendant all agreed that Victor, then almost nineteen months, should be moved to her care, which was done just after Thanksgiving. Defendant's counsel requested an adjournment of the January 2020 trial date, arguing that were defendant acquitted at his upcoming trial, he could become available to complete services and care for Victor, his incarceration being "the biggest barrier to him being unified with the child." After initially denying the request, citing Victor's need for permanency, the court thereafter granted an adjournment until March when defendant's criminal trial was expected to have been completed.

In March, of course, the COVID-19 pandemic shut down trials, and the court began to convene case management conferences via video conference. At the April conference, defendant's counsel reported his criminal trial had gone forward as scheduled in February, resulting in his conviction on unspecified drug charges on which he had yet to be sentenced. The court

---

[5] Although Victor's resource parents, who had cared for him since birth, were committed to him, their situation had suddenly and drastically changed with the unexpected death of the resource father in July 2019.

A-1080-21

ordered the Division to schedule a bonding evaluation with defendant's niece and Victor.

The following September, the court ordered visitation between Victor and his maternal aunt, who with her husband had custody of four of Victor's half-siblings. The court also established a new trial date in January 2021, with a pre-trial conference to occur in December. Defendant advised the court he'd been sentenced in one of his criminal matters but that another remained to be adjudicated. He refused to discuss his criminal matters further, however, claiming they were irrelevant to the guardianship case.

The guardianship trial did not go forward in January due to the ongoing pandemic. The court did, however, conduct a case management conference that month, at which defendant's counsel advised his client wished to proceed on his own behalf going forward. Counsel advised he had explained to defendant he could be permitted to represent himself in accordance with N.J. Div. of Child Prot. & Permanency v. R.L.M. (In re R.A.J.), 236 N.J. 123 (2018), so long as the court was satisfied his decision was informed, unequivocal and completely voluntary. Counsel also represented he'd discussed the concept of standby counsel with defendant, and that he would be

A-1080-21

willing to accept counsel's assistance in that role were the court to grant defendant's request to proceed pro se.

The court engaged defendant in a colloquy, initially asking whether defendant thought he understood enough of the legal process of a guardianship proceeding to capably represent himself. Defendant explained the case from his view was "quite simple." He claimed he'd read "some thousand" appellate and Supreme Court cases on termination of parental rights and believed he should never have been made a party to the action. He claimed the Division was attempting to hold him accountable for "[D.D.'s] shortcomings." In addition, he maintained the Division could not establish "the four prongs, which is the only criteria," because its contention that he "abused and neglect my son, which I just found out I had a son and never held him," was "ridiculous."

Defendant expressed the view that the Division thought he wasn't "paying attention to the law" and was "banking on these relationships they got with the judge" to terminate his parental rights. Defendant told the court he wanted to represent himself because he wanted "to fill out the record with my facts and what I know about parental termination" "because the only way I feel as though I'm going to get justice is in the[] appellate courts."

7

Defendant further contended the public defender's office was not independently working on his behalf or "representing [him] right" because given what he'd read, the Division didn't "stand a chance" on appeal and would only prevail in the trial court based on what "they got going on in these courts and my lawyer." Defendant contended his lawyer "should have been fighting hard for [him]" and not let the Division "twist and turn a law to prove that I neglected and abused my son that I just found out I had." Defendant contended that "it's millions of people that come through these prisons" and the State could not terminate a parent's rights simply because they were in prison.

The court asked several more questions to ascertain whether defendant understood he would need to follow the directions of the court, that he would be held to the court rules, that he would have to be respectful when others were speaking and not be disruptive, the difference between posing questions on direct and cross-examination, and whether he thought he had "the ability to be able to control [his] emotions and represent [him]self," even when a ruling went against him. After defendant assured the court he did understand and could comport himself in the manner expected, the court asked if there was anything the Division would like to ask.

A-1080-21

The deputy on behalf of the Division expressed concern over defendant's grasp of the law "because the Division never alleged that he abused or neglected his child." The deputy explained "[e]verybody knows that he's really never even met this child and he never had the chance to abuse or neglect the child." She maintained the Division's case was premised on defendant's unavailability "because of his situation . . . to parent this child" and defendant "seems to be stuck on" the Division saying he'd abused or neglected his child when "[n]obody has ever said that to him."

The court asked defendant whether he followed what the deputy was saying about it appearing he misunderstood the Division's position. Defendant responded that the Division had to prove the "four prongs" and could not terminate an individual's parental rights simply "because they were in jail and couldn't care for the kids." Defendant again maintained the Division's position was "ridiculous" and would "open the door for them to start attacking everybody that was in jail that got kids."

The court pronounced itself satisfied defendant had the ability to understand the proceeding and believed himself competent to proceed on his own behalf. After defendant expressed a willingness to have his counsel assume the role of standby counsel through trial, the court appointed him and

9

questioned defendant as to whether the Department of Corrections would allow him to store the discovery so he could readily access it to prepare for trial. Defendant advised the DOC allowed him to maintain the documents in his cell, which satisfied the court.

In other developments, the Division advised D.D. had surrendered her parental rights to allow Victor's adoption by her sister or defendant's niece, and the court again approved the Division's plan of termination of parental rights followed by adoption. Defendant consented to allowing standby counsel to make a request to adjourn the trial until May to allow defendant adequate time to review the discovery and prepare for trial in anticipation of loosening COVID restrictions in the prisons. The court granted defendant's request.

In early February, defendant's niece determined she could not wait any longer for Victor to be available for adoption as she wished to move out of State, and believed Victor might be better off with his maternal aunt and her husband, who had agreed to assume his care. By mid-February, the Division had moved Victor, then almost three-years-old, to his maternal aunt and uncle.

The new arrangement was discussed at the April case management conference, as was the scheduling of a bonding evaluation between Victor and his new caretakers, which was anticipated to occur the following August or

10

September, six months after Victor's move, necessitating a further adjournment of the trial date until November 2021. The judge asked defendant if he was aware of the new arrangement or had any questions about Victor. Defendant replied he was aware of the new arrangement and had no questions about the boy as his sister and niece kept him updated when they visited Victor at his aunt's house. Asked whether he thought the change in caretakers was a good thing, defendant replied, "I mean, it's a good thing for right now."

Defendant advised the court he wanted to address another issue, that being the use of his recent judgment of conviction, which had been included in the discovery the Division provided him and mentioned in his psychological evaluation. Defendant asserted that judgment was "in the Appellate Division" and, in the event it was overturned, the Division would have been permitted to enter "some false evidence into the record to try and use against [him]."

The Division responded that defendant's prior convictions were not on appeal and his current "sentence and his unavailability to parent is a relevant factor," which is why it was included in the discovery. The court explained to defendant his record of convictions was properly included in the discovery and that he would have the opportunity to object in the event the Division determined to rely on it at trial. Defendant indicated he understood, and the

A-1080-21

court inquired as to defendant's parole date. Defendant advised the date was "probably two-and-a-half years" away but again stressed the conviction was on appeal, and noted he had another case scheduled for trial in July.

When defendant advised he was representing himself on that case as well, the court asked whether the case was before a jury and if defendant had standby counsel. Defendant answered affirmatively to both questions, leading the judge to offer "a personal piece of advice." The judge explained he'd spent a number of years presiding over criminal trials and had once been faced with a defendant requesting to represent himself. The judge advised he'd granted the application because the defendant was "smart enough and aware of case law and things of that nature," but the trial turned out to be "a disaster for the defendant." The judge offered "that, you know, sometimes you feel like you have enough knowledge, but the people who do those kind of things on a daily basis are . . . usually much better at representing people than having someone represent himself." When the judge asked defendant, "Did you hear me," defendant replied, "Yeah, I hear you."

At the pre-trial conference, the court noted standby counsel reviewed the proposed order with defendant prior to the conference as had been his practice since defendant began representing himself. The court at that conference

12

A-1080-21

inquired of defendant whether the standby counsel arrangement was "working out for [him] okay," to which defendant replied, "Yes." In discussing the proposed witnesses at trial, the judge advised defendant that should he choose to testify, he would be subject to cross-examination and urged him to consult with his criminal attorney or standby counsel, warning him "to be careful about anything you say that might be used against you in a subsequent criminal case."

Before the Division called its first witness at trial a few weeks later, the court again revisited defendant's decision to represent himself. The court reviewed its prior decision to grant defendant's application to proceed pro se. Noting that while it "totally did not recommend that to you," it had been "satisfied" regarding defendant's ability to do so and asked whether it was still his position to proceed on his own behalf at trial. When defendant replied it was, the court reminded him standby counsel would be present throughout the trial "in case you have any questions."

The Division called three witnesses, Victor's maternal uncle, the adoption worker responsible for the matter and Dr. Brandwein. The adoption worker testified he'd gone to the prison to meet with defendant each month since June 2019. He agreed with defendant on cross-examination that the two

had a good, cooperative relationship, defendant had been "real excited" when he learned he was Victor's father, and that he'd been in favor of Victor moving to his maternal aunt and uncle when his niece decided to move out of state. He also agreed with defendant that Victor's maternal aunt was initially cool to caring for Victor, although she was happy to have him visit, because she did not want to deal with the Division based on past experiences. The worker testified it was defendant's niece who made the initial contact with Victor's maternal aunt and "bridged the gap between [her] perception of the requirements [for adoption] and the Division's actual requirements," resulting in Victor's aunt becoming committed to having him live with her family. Defendant testified he facilitated the connection between his niece and Victor's maternal aunt, which he characterized as "my work."

Victor's uncle testified the toddler had been living with him and his wife and four of Victor's half-siblings for over eight months, and they wished to adopt him. The witness testified the Division had explained the difference between adoption and kinship legal guardianship, and that he and his wife preferred adoption for the security it provided Victor, explaining "[i]t would be more stable."

14

The witness testified he and his wife were "not opposed" to allowing Victor to have a relationship with defendant on his release from prison. He explained, however, that they "went through" KLG "with the other children" and "[i]t was just a constant back and forth with the father having issues with wanting to make decisions against our decisions." He testified "[i]t just made everything really difficult," was "[v]ery disruptive," and he and his wife didn't want to go through it again.

Dr. Brandwein testified to his evaluation, the tests and assessments he had administered to defendant and the interview he conducted of him at Trenton State Prison. Dr. Brandwein explained he'd administered the Kaufman Brief Intelligence Test to defendant and determined him to be "functioning in the below average to average range," which gave him no concern and was "[c]ertainly . . . not an impediment to safe parenting." He further testified defendant scored in the medium risk range in the parenting inventory, making him "no more a risk to engage in child maltreatment than the average parent."

Dr. Brandwein, however, did not recommend continuing defendant's parental rights to Victor. The doctor diagnosed defendant as suffering from antisocial personality disorder, marked by "a proclivity to engage in impulsive illegal behavior that results in . . . incarceration," which "[o]bviously . . .

15

directly prevents parenting." He described defendant's insight and judgment as poor and the prognosis for change "dismal" based on defendant's "extensive history of criminal behavior and incarceration." While Dr. Brandwein conceded in response to defendant's questions on cross-examination that incarceration and an extensive criminal history did not disqualify him from being a parent, he maintained "if you're incarcerated you cannot parent, that's just a fact." The doctor further noted that even were defendant's conviction reversed on appeal, he would not be in a position to safely parent Victor. Dr. Brandwein emphasized Victor had already spent his whole life in placement. The doctor maintained if defendant were released tomorrow, he would still need time to demonstrate his successful reintegration into the community. He would need to find work and housing and have "a period of time where he did not re-offend," time which Victor's situation would not allow.

Dr. Brandwein opined defendant endangered Victor's safety, health and development by being unavailable to parent him and continues to be unable to provide him a safe and stable home due to his current sentence of incarceration and his antisocial personality disorder, which Dr. Brandwein believed had already had a long-term and profound impact on defendant meeting his own needs, much less those of a child. Dr. Brandwein further testified that Victor

16

had already had three placements in his short life, and while he had managed them well, particularly as defendant's niece remained a presence in his life, further disruptions would place the child at serious risk of harm. The doctor believed Victor had become securely bonded to his aunt and uncle and that being raised with his siblings would provide him a strong sense of belonging. Noting Victor has never met his father, Dr. Brandwein opined that under the circumstances, the termination of defendant's rights would not do the child more harm than good.

Defendant testified in his own behalf. He averred that he'd never heard of "somebody's rights being terminated just because they [were] in jail," and complained about "all types of dirty tricks" the Division used in pursuing the case against him, including "grabbing up [his] judgment of conviction" and trying to use his past against him. He complained the Division's expert misrepresented him in the expert's report to "establish some type of a narrative that I'm unfit, antisocial, my intelligence is below average," and "just destroyed me." He maintained the entire proceeding "was rigged against [him]." Defendant contended the Division was "overreaching" in attempting to terminate his parental rights and if allowed to do so "because I'm in jail and I got a criminal record and I'm not available, then what's going to stop them

17

from going after people that's in the psych ward recovering from mental [illness]? What's going to stop them from attacking people that [are] involved in a drug program or coming from drug addiction?"

After hearing the testimony and reviewing the evidence, the judge put a thorough and thoughtful opinion on the record explaining his decision to terminate defendant's parental rights. The judge had no hesitation finding the Division established all four prongs of the best interests standard, N.J.S.A. 30:4C-15.1(a)(1)-(4), by clear and convincing evidence. As to the first prong, the judge found the Division established defendant endangered Victor's safety, health and development not only by being unavailable due to his incarceration but also because his antisocial personality disorder made his ability to safely parent Victor remote, as Dr. Brandwein testified.

The judge noted defendant had never met Victor, and the evidence in the record established he never sought to have the child visit. The judge found defendant had been incarcerated for all three years and seven months of Victor's life and, unless his appeal is successful, will continue in prison until at least his first parole eligibility in 2024, and perhaps until his full term ends in 2028, thereby establishing his inability to provide Victor a safe and stable home in the foreseeable future under the second prong. The judge noted

18

defendant's position was that he was the child's father, and was thus not hurting him, which the judge found disregarded and failed to account for Victor's need for permanence. The judge found it didn't matter in defendant's opinion that Victor didn't have stability because the boy was placed with relatives. The judge noted, however, that those relatives were asking to be able to adopt Victor, promising to be there for him now and throughout his formative years and beyond. The court found Victor's aunt and uncle provided him the promise of a safe and stable home with his half-siblings and that delaying his permanent placement will only add to the harm Victor has already suffered by the failure of his parents to care for him.

The judge was also satisfied the Division made reasonable efforts to provide services, noting it acted on defendant's wish to have Victor live with defendant's family. And when defendant's niece decided she did not want to continue as Victor's parent, the Division placed him with his maternal aunt and uncle, an arrangement the court credited defendant for facilitating. The judge also noted the Division's efforts in having the adoption worker meet with defendant each month at the prison, keeping him apprised of the proceedings.

With regard to the fourth prong, the judge relied on Dr. Brandwein's testimony that Victor was securely bonded to his aunt and uncle, who had been

19

caring for him following his third placement in three years. Dr. Brandwein opined they represented Victor's best option for permanency, and also allowed him to grow up with his half-siblings. Dr. Brandwein opined that given Victor had never met defendant, terminating his rights is "highly unlikely to do more harm than good," and the judge found doing so would be in the boy's best interests.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012). We generally "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)). As our Supreme Court has reminded in respect of termination of parental rights, "a trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Having reviewed the trial record, we are satisfied the judge's findings are

amply supported, and none of the issues defendant raises on appeal impugns those findings in any fashion.

Defendant's first point, that Victor's aunt and uncle did not understand the differences between KLG and adoption warranting reversal as a matter of law, is utterly without merit. Defendant bases his claim on Victor's uncle having testified that he and his wife, who have custody of Victor's half-siblings in a KLG, had experienced "a constant back and forth with the [children's birth] father . . . wanting to make decisions against our decisions," making "everything really difficult," and that he and his wife didn't want to go through it again.

Defendant contends that "[c]ontrary to the [witness's] understanding, a birth parent who has relinquished their child in a KLG does not have a right to make decisions for their child. A guardian assumes the rights equal to 'a birth parent.'" N.J.S.A. 3B:12A-4(a)(1). While defendant is, of course, correct as to the law, the witness was obviously not opining on the law. Instead, he was testifying as to his experience of the difficulties of raising a child in a KLG when the birth parent opposed child-rearing decisions he and his wife made, resulting in their rejecting KLG in this case in favor of adopting Victor.

21

Nothing in the record suggests Victor's aunt and uncle misunderstood the differences between KLG and adoption.

We also reject defendant's contention that the court failed to engage in a meaningful colloquy regarding defendant's decision to proceed pro se and abused its discretion in permitting him to represent himself. Parents in termination cases have the right to represent themselves, constrained only by the judge's "responsibility to reach an informed and fair determination of the child's best interests, and the child's interest in permanency." R.L.M., 236 N.J. at 149.

When a parent "clearly and unequivocally" invokes his right of self-representation, as defendant did here, the court is only obligated to engage in "an abbreviated yet meaningful colloquy to ensure the parent understands the nature of the proceeding as well as the problems she may face if she chooses to represent herself." In re Adoption of J.E.V., 226 N.J. 90, 114 (2016). The Court has made clear the colloquy need not be as extensive as the one a judge conducts when a criminal defendant seeks to proceed without a lawyer. R.L.M., 236 N.J. at 150. The goal is for the judge to satisfy herself that the parent understands the nature of a termination case and the disadvantages of proceeding without a lawyer. Ibid.

22

A review of the record makes abundantly clear the judge discharged his obligation to ensure defendant both understood the proceedings and was aware of the disadvantages of foregoing representation by his appointed counsel. In the initial colloquy in January 2021, defendant made clear he understood the Division had to prove all "four prongs" of the best interests standard, the "only criteria" for terminating his parental rights. When the deputy raised a concern about defendant misunderstanding the basis of defendant's complaint, the judge asked several more questions to ensure defendant understood the Division's case rested on his unavailability to Victor because of his incarceration, prompting defendant to repeat that the Division had to prove the "four prongs" and could not terminate a parent's rights "because they were in jail and couldn't care for the kids," which is a correct statement of the law in New Jersey. See N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 556 (2014).

When the judge asked defendant why he wanted to forego the lawyer the State had provided him, defendant expressed his mistrust of the entire setup and the obvious professional familiarity among the lawyers and the court. Defendant told the judge he wanted "to fill out the record with [his] facts and

what [he] know[s] about parental termination," because he wanted to create the record we would view on appeal.

Forcing defendant to proceed with counsel in light of defendant's expressed concerns would have been error in our view. Although it would have been better had the court also reviewed the disadvantages of defendant representing himself in that first colloquy, the record makes clear the judge made those points known to defendant on a number of other occasions, each time asking defendant again if he was committed to proceeding without a lawyer. Our review of the record convinces us the court correctly permitted defendant to proceed on his own behalf, appointing as stand-by counsel the lawyer appointed to represent defendant by the Office of Parental Representation, who was intimately familiar with the case, having represented defendant from the time he was joined and with whom defendant had a solid working relationship.

Further, the judge took special pains throughout the proceeding to ensure defendant understood what was happening in the courtroom and was patient and solicitous of defendant's rights throughout the proceeding. As the Court has observed, it is the trial court that is best positioned "to evaluate defendant's understanding of what it meant to represent himself and whether defendant's

24

decision to proceed pro se was knowing and intelligent."  State v. DuBois, 189 N.J. 454, 475 (2007).  We find no abuse of discretion.

Defendant's third point, that the Division's expert "administered an I.Q. test [to defendant] for no reason but to show that [defendant] was a black man with below average intelligence," evoking "a racial trope that has historical underpinnings," and thus the judge erred in relying on the expert's opinion in finding the Division established the first and fourth prongs, is without sufficient merit to warrant discussion in a written opinion.  See R. 2:11-3(e)(1)(E).  There is nothing in the record to suggest the Division's expert acted in any way contrary to his customary and usual practice in including an abbreviated intelligence test among the several assessments and inventories he administered to defendant as part of a confidential psychological evaluation.

Moreover, when questioned at trial, the expert testified the tests he administered are generally accepted psychological measures regularly used by psychologists performing parent evaluations.  And defendant — represented on appeal by the Office of Parental Representation, counsel uniquely positioned to refute that statement were it not so — has offered nothing to suggest tests measuring a parent's intellectual functioning are not routinely administered in guardianship matters, or that the expert did so inappropriately here based on

defendant's race. Defendant did not present his own expert to offer any of the opinions he offers in his brief about the appropriate use of tests of a parent's intellectual functioning in a psychological evaluation in a guardianship case.

In addition to charging the expert with explicit bias, with no proof as far as we can tell, defendant also raises the specter of implicit bias and points to our courts' efforts to combat it in jury selection, see State v. Andujar, 247 N.J. 275, 302-03 (2021). Although we would not be surprised by examples of implicit bias in the child welfare system, or even in the conduct of guardianship proceedings, defendant does not provide us any examples of such. Instead, he asserts, again without proof, that the Division had no purpose in requiring defendant to take a test measuring his intellectual functioning "except to embarrass and to impugn this parent's dignity by questioning his intellectual abilities," and that its expert "tainted the integrity of the family court's findings and legal conclusions by embedding an odious racial trope in his conclusions." Because we find no support for defendant's charges in the record, and defendant does not explain how the expert's opinion that he had no concern with defendant's intellectual functioning, which was "[c]ertainly . . . not an impediment to safe parenting," could have "tainted" the

26

court's findings on the first and fourth prongs, we deem the issue unworthy of further consideration.

Finally, we reject defendant's argument, raised for the first time on appeal, that the court erred in finding the Division carried its burden on the third prong because the Division did not make reasonable efforts to provide visits between defendant and Victor between May 1, 2021, when the DOC reopened the prisons to in-person visits, and trial six months later. As noted by the trial judge, there is no evidence in the record defendant ever sought visitation at any time, and defendant does not contend otherwise on appeal. Further, there exists no indication in the record as to whether visits would have been possible or whether they were suitable for Victor.[6] Because of the absence of evidence in the record on these points, we cannot set aside the court's findings on the third prong based on the Division's failure to arrange visits between defendant and Victor.

---

[6] We noticed, as did the law guardian, the several references in the record to enhanced security when defendant appeared in court on occasion and when he was evaluated by the Division's expert at the prison, with the law guardian suggesting it was unclear if defendant was even permitted visits. Defendant made no response to that suggestion in his reply brief, and we note he referred at trial to having been in "twenty-three-one lockup" requiring monthly psychological evaluations. What is clear is that the Division never barred visits and there is no indication in this voluminous record that defendant ever sought visits with Victor.

A-1080-21

Defendant has maintained throughout this matter that his current incarceration and past criminal history are irrelevant to his ability to parent his son. New Jersey law is otherwise. Although our Supreme Court has held that incarceration, standing alone, is an insufficient basis on which to terminate a parent's rights, R.G., 217 N.J. at 556, a parent's incarceration "bear[s] materially and directly on the parent-child relationship," and is thus "unquestionably relevant to the determination of whether the parental relationship should be terminated," In re Adoption of Children by L.A.S., 134 N.J. 127, 136-37 (1993).

Here, defendant was not in a relationship with Victor's mother, and was not aware she had become pregnant and given birth to a child until Victor was over a year old. As already noted, he has never met the boy, now four-and-a-half years old. While the guardianship case was pending in the trial court, defendant was convicted of second- and third-degree drug charges, including the sale of fentanyl, and sentenced to a fifteen-year extended term as a persistent offender with a seven-and-a-half-year parole ineligibility term. Defendant, forty-one years old at sentencing in July 2020, already had nine prior indictable convictions dating back to 1997, including convictions for drug offenses, aggravated assault, theft and promoting child prostitution, and

28

had served six prior terms in State prison.  He also has a lengthy juvenile record of six adjudications, serving two terms at the Training School for Boys at Jamesburg.

Defendant has never acted as a parent to Victor and his incarceration until at least the expiration of his parole ineligibility term in 2024 precludes his doing so in the near term.  The trial court accepted the unrebutted testimony of the Division's expert that even were defendant released from prison tomorrow, he would still have to show he could obtain housing and employment and that he could remain law-abiding, which the expert deemed unlikely given defendant suffered from antisocial personality disorder that has already had profoundly adverse effects on his life and is difficult to treat effectively — the combination making it highly unlikely he could safely parent Victor in the foreseeable future.

Given the absence of any relationship between Victor and his father, the unrebutted expert testimony was that termination would not do the child any harm.  While defendant immediately took steps on learning he was Victor's father to have him cared for by members of his family, as defendant's incarceration prevented him from doing so himself, and later facilitated Victor's transition to his maternal aunt and uncle, thus ensuring he would

29

continue to be cared for by family — both steps to be lauded — neither assured Victor the permanency our law prioritizes for children. Victor's aunt and uncle have offered him a secure and stable permanent home with his half-siblings, continued contact with his paternal family and the possibility of contact with his father in the future. Given the realities of defendant's situation and Victor's, defendant has provided us no basis to overturn the careful findings of the trial court supporting termination of his parental rights.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1080-21